ARTHUR S. LANGENDERFER, INC.; Northern Ohio Asphalt Paving Co.; MacRitchie Materials, Inc.; M & B Asphalt Co., Inc. and G.M. Sader Excavating & Paving, Inc., Plaintiffs–Appellees, Cross–Appellants,

v.

S.E. JOHNSON CO.; Ohio Engineering Co.; Price Brothers, Inc.; Fred Creager & Sons, Inc.; Matco Asphaltic Concrete Products Co.; OAMCO; C.P. Calaway, Inc.; Maumee Stone Co.; Michigan Stone Co.; Wolcottville Sand & Gravel Corp.; Stoneco, Inc.; Saxton Development Co. and J.T. Kirby, Defendants–Appellants, Cross–Appellees.

Nos. 87–3543, 87–3577, 87–3881, 87–3882, 88–3126, 88–3127, 88–3435, 88–3574 and 88–3651.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 18, 1990.

Decided Oct. 29, 1990.

Rehearing and Rehearing En Banc Denied Jan. 23, 1991.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

James M. Porter, Squire, Sanders & Dempsey, Walter J. Rekstis, Virginia A. Seger, Cleveland, Ohio, Thomas Zraik, Reiser & Zraik, Toledo, Ohio, for plaintiffs-appellants cross-appellees.

Thomas E. Kauper, Ann Arbor, Mich., John M. Curphey, Jack Zouhary, Robison, Curphey & O'Connell, Toledo, Ohio, M. Neal Rains, Paul H. Friedman, Irene C. Keyse–Walker, Arther & Hadden, Cleveland, Ohio, for defendants-appellees cross appellants.

Doreen C. Johnson, Columbus, Ohio, for amicus curiae, State of Ohio.

Before MARTIN and WELLFORD, Circuit Judges, and LIVELY, Senior Circuit Judge.

WELLFORD, Circuit Judge.

The parties in this antitrust controversy are, or were at one time, involved in businesses related to road and highway construction in northwestern Ohio. Plaintiff Arthur S. Langenderfer, Inc. (Langenderfer) was an asphalt paving contractor that ceased operations in 1978, allegedly due to defendants' antitrust violations. Northern Ohio Asphalt Paving Co. (NOAP), a sister company of Langenderfer, is an asphalt producer. Langenderfer and NOAP were the original plaintiffs in a related case, *Langenderfer v. S.E. Johnson Co.*, 729 F.2d 1050 (6th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984) (*Langenderfer I*), a case in which this court vacated judgment based on a verdict in favor of plaintiffs and remanded for a new trial.

## I. GENERAL BACKGROUND

While the *Langenderfer I* appeal was pending, the original plaintiffs were joined by other plaintiffs in a companion case, and when *Langenderfer I* was decided and a remand effectuated, the separate actions were consolidated. One of the "new" plaintiffs is MacRitchie Materials, Inc. (MacRitchie), a limestone supplier and sister company of Langenderfer and NOAP that was denied leave to intervene in *Langenderfer I. See* 729 F.2d at 1060. The other new plaintiffs are M & B Asphalt Co., Inc. (M & B), an asphalt producer, paving contractor, and limestone quarry operator, and G.M. Sader Excavating & Paving Co., Inc. (Sader), an asphalt paving and excavating contractor. The defendant companies (which shall be referred to collectively as "Johnson") are commonly owned, and are involved in various aspects of the road construction business. Defendant John T. Kirkby is the president of Johnson and chief executive officer of the Johnson entities.

In the *Langenderfer I* trial, plaintiffs relied largely on evidence of alleged predatory pricing in bidding on public road projects. Plaintiff introduced no evidence to indicate that defendants' bids were less than defendants' total average costs, and we held that the trial court did not instruct the jury properly on the legal standard for a predatory pricing antitrust violation. Because the predatory pricing claim could not stand separately as a matter of law, and because it was unclear whether the jury verdict was based on predatory pricing or on other alleged anticompetitive behavior, we vacated the judgment in favor of plaintiffs in *Langenderfer I*, and remanded for a new trial. We noted that in order to prevail on a claim of monopolization or attempt to monopolize, plaintiff must "establish that Johnson engaged in some type of prohibited anticompetitive conduct." 729 F.2d at 1054-55.

Plaintiffs in the current action allege that the defendants violated § 2 of the Sherman Act by monopolizing and attempting to monopolize "the production and supply of highway construction materials and in the bidding, construction and repair of asphalt highways" in a thirteen-county area of northwest Ohio. These highway projects were administered on a competitive bidding basis by the Ohio Department of Transportation (ODOT) and/or the Ohio Turnpike Commission (OTC). Defendants assert once again in defense of the charges that Johnson's success relative to the plaintiffs was the result of better foresight and management, which led to diversification, improved efficiency, and lower costs.

The allegations of plaintiff Sader differed significantly from those of the other plaintiffs, because Sader was not an actual competitor in ODOT/OTC work. Instead, Sader did mostly private paving work, but alleged that it relied on Johnson for raw materials, and that Johnson terminated Sader's credit in retaliation for the testimony of Sader's president, Gregory Sader, in *Langenderfer I*. Johnson maintained, on the other hand, that the credit cut-off was for legitimate business reasons. We shall deal with the claims of each of the plaintiffs independently.

The jury made the following findings, after submission of special interrogatories:

1. As to all plaintiffs except Sader, relevant product markets included limestone, sand, and asphalt used in ODOT and OTC paving contracts, as well as the ODOT and OTC paving contracts themselves.

2. The relevant geographic market for *all* plaintiffs was the thirteen-county area.

3. Defendants possessed monopoly power, defined as "the power to control prices or exclude competition," in all of the relevant product markets, and that power was willfully acquired, maintained, or used through anticompetitive conduct. Asked to describe one or more types of anticompetitive conduct, the jury replied, "The acquisitions were all made to exclude and/or injure competition and increase Johnson's power which he succeeded in doing." [1]

4. Defendants' monopolization caused injury to all of the plaintiffs (including Sader).

5. Defendants possessed the specific intent to achieve a monopoly in all of the relevant markets, engaged in anticompetitive conduct toward that end, and there was a dangerous probability that they would achieve a monopoly.

6. Defendants' attempt to monopolize caused injury to all of the plaintiffs (including Sader).

7. Damages (before trebling) were $1,675,000 for Langenderfer and NOAP; $200,000 for MacRitchie; $350,000 for M & B; and $250,000 for Sader.

The trial court entered judgment in accord with the verdict, trebling the damages found by the jury, and allowing payment of interest at the annual rate of 5.79 percent until paid.

On appeal, defendants contend that as a matter of law, no monopoly power may be found in the supply of sand, limestone, asphalt, or in bidding and performance of state and turnpike jobs.

In addition, defendants maintain that plaintiffs failed to support allegations of anticompetitive conduct, relying instead on evidence of Johnson's above-cost bids, contrary to the holding of *Langenderfer I.* In addition, Johnson asserts that the thirteen-county area cannot represent the relevant market for M & B, which performs most of its work in only two counties and has never actually worked in the majority of the thirteen counties found to be the relevant market. Johnson makes a similar contention as to Sader. As an affirmative defense, Johnson claims that MacRitchie lacks antitrust standing, and that Sader may not recover under § 2 of the Sherman Act based on Johnson's revocation of Sader's credit privileges.

The original Johnson Company was founded in 1929 by Sherman Johnson, who died in 1956. The company then owned three stone quarries and three hot-mix plants, and was the largest asphalt paving contractor in northwest Ohio. Following Mr. Johnson's death, defendant Kirkby became the principal operating officer in 1957. At that time, plaintiff Langenderfer was the second largest asphalt paver in the area. Beginning in 1961, Kirkby, as principal officer on behalf of defendants, embarked on a series of acquisitions, described by this court in *Langenderfer I.* 729 F.2d at 1053–54.

We vacated and remanded the first judgment because the proper legal standards were not applied, particularly as to predatory pricing. We stated, however, that there was "[s]ubstantial evidence indicat[ing] that Kirkby, both individually and

---

1. The jury instructions listed the following six alleged anticompetitive acts:
 1. Monopolistic stone pricing;
 2. Price or profit squeezing and cross-subsidization;
 3. Leveraging its position in ODOT and OTC;
 4. Tying the sale of stone and sand to the sale of asphalt;
 5. Intimidating, discouraging, coercing and retaliating against competitors;
 6. Refusal to sell stone to Sader.

 Defendants assert that because the jury's above-reflected response to the interrogatory did not list any of these six alleged anticompetitive acts, its findings were not consistent with a violation of the antitrust laws. The trial court found, however, that the jury's response to this "one or more" question was not inconsistent with the general verdict.

as chief officer of Johnson, intended to eliminate competition and dominate the market." *Langenderfer I* at 1054. Furthermore, in the first appeal, we noted that there was expert testimony by economists to the effect that Johnson's acquisitions created "significantly increased market concentration," and therefore had a tendency to create a "monopolistic market structure." *Id.* at 1054.

After remand by this court, plaintiffs amended their complaint asserting that Langenderfer was a general paving contractor until "forced out of business by the defendants[2] in 1978." NOAP asserted that it was in the business of purchasing sand and stone, mixing these at asphalt plants, and selling the resulting materials to Langenderfer, asphalt pavers, and others. These plaintiffs asserted that Johnson, Ohio Engineering, and Creager were competitors in constructing and repairing highways and roads in northwestern Ohio with Langenderfer, and that "business is generally performed ... after competitive bidding by the governmental authorities." Langenderfer alleged that it "customarily carried on its procurement of materials through plaintiff NOAP." Plaintiffs averred that to minimize costs, "the paving contractor normally purchases highway construction materials for the quarry or asphalt plant located closest to the job site."

Defendants were charged with "unlawfully combining in restraint of interstate trade and conspiring to monopolize and attempt to monopolize ... in the production and supply of highway construction materials and in the bidding, construction and repair of asphalt highways." In addition, plaintiffs charged that defendants quoted and charged them higher prices for stone, sand, or asphalt than those charged to defendant paving contractors. They also charged defendants with refusing to sell these materials, tying sales of stone and sand to asphalt, and other "predatory" practices, including forcing competitors out of the sand, stone, and asphalt business by these practices, all done with requisite anticompetitive intent.

Defendants denied the charges of unlawful anticompetitive conduct and averred that a corporate restructuring took place in 1986 leaving S.E. Jason Companies, Inc. as the only active Johnson entity with wholly owned subsidiaries Creager, Stoneco (formerly Oamco, Inc.), and Alloy Founders.[3]

A basic issue in the retrial of this case arose in defendants' motion to exclude evidence of alleged predatory bidding by reason of our holding in *Langenderfer I.* The district court agreed with plaintiffs and held bidding practices admissible because such practices may "portray the effects of defendants' long term monopolization of this market."[4] Even if some of the

---

2. Defendants named were the Johnson companies, Ohio Engineering Co. (Ohio), Fred R. Creager & Sons, Inc. (Creager), Matco Asphaltic Concrete Producing Co. (Matco), OAMCO, Inc. (OAMCO), C.P. Calaway, Inc. (Calaway), Maumee Stone Co. (Maumee), Michigan Stone Co. (MSC), Wolcottville Sand & Gravel Corp. (WAS & G), Saxon Development Co. (Saxon), Stoneco, Inc. (Stoneco), and J.T. Kirkby.

3. Defendants also responded that Ohio & Metro "no longer exist," and that Calaway "is currently an inactive corporation" (as of July 1986). Johnson answered that Maumee & MSC merged into it; that WAS & G "operated a sandpit in Indiana and became inactive and is now inactive, but that WAS & G's assets, after reactivation, were transferred into Stoneco." Defendants further answered that Saxon "is inactive and has no current business activities." Kirkby was alleged, in the answer, to have owned less than a five percent interest in Johnson at all relevant times.

4. We do not endorse the reason given by the district court for this ruling. While we find no error in the holding that evidence of bidding practices may be relevant and admissible, we do not believe, as asserted, that its exclusion would be to "direct a verdict for defendants." We held in *Langenderfer I* that bidding "above the *total* average costs" of defendants was not an antitrust violation under the Sherman Act, and that the proper test for anticompetitive conduct in that regard was not whether defendants' bids were "above competitors' costs." 729 F.2d at 1055. The effect of *Langenderfer I,* it should be observed, was to set aside the judgment based upon plaintiffs' asserted cause of action for predatory pricing, which was the thrust of the first trial and appeal. The district court, however, charged the jury to the above effect. Plaintiffs' experts emphasized what they perceived to be low bidding and "predatory pricing" conduct of defendants.

evidentiary emphasis in the second trial was on the asserted predatory bidding practices of defendants, and this is a separate charge from monopolization or attempted monopolization, we find the ruling to permit such evidence not to be prejudicial error under all the circumstances. It is clear, nonetheless, that a considerable portion of plaintiffs' proof was directed towards defendants' low bidding procedures, and plaintiffs, as well as their experts, relied heavily on this testimony throughout, despite defendants' objections.

Section 2 of the Sherman Act makes it unlawful for any "person" to "monopolize, or attempt to monopolize, or combine or conspire ... to monopolize any part of the trade or commerce among the several States." In construing a § 2 claim, the Supreme Court has held that a plaintiff must establish "(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Such prohibited power includes "power to control prices or exclude competition." *Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. at 1704; *United States v. E.I. duPont*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956).

## II. STANDARD OF REVIEW

Defendants' appeal is from the district court's denials of the motion for directed verdict and for judgment notwithstanding the verdict. In considering a motion for directed verdict, "the trial court 'must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury.'" *Milstead v. International Brh. of Teamsters*, 580 F.2d 232, 235 (6th Cir.1978), *quoting O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir.1975). Sufficient evidence "is such that, when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable men could differ. *Appellate courts apply this same standard.*" *Milstead*, 580 F.2d at 235 (citations omitted) (emphasis added). This same standard applies to motions for judgment n.o.v. *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104 (6th Cir.1978), *cert denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

We therefore consider whether plaintiffs have carried their burden of showing monopoly power and anticompetitive conduct.

[A]s the case is presented to us, we must interpret the entire record in the light most favorable to [plaintiffs] and give to [them] the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn....

Moreover, we must assume that the jury followed the court's instructions.

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604, 105 S.Ct. 2847, 2858, 86 L.Ed.2d 467 (1985), citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962).

In applying the *Aspen Skiing* standard to the facts submitted to the jury, it is worth noting that this is the second jury to find in favor of plaintiffs Langenderfer and NOAP with regard to elimination of competition and domination of the market claims.

Once the jury has acted, we set aside its verdict and the district court's refusal to grant a j.n.o.v. motion only if we are satisfied, upon a thorough review of the record, that error has been committed. We also give plaintiffs the benefit of reasonable and favorable inferences that may be drawn from the evidence. We may not pass upon credibility of witnesses in making this review. To the extent, of course, that the district court drew or made legal conclusions based on the jury's responses to interrogatories, we may review decisions of law *de novo*.

## III. M & B CLAIM

■ M & B has been in the asphalt paving business in several Ohio counties since about 1957. According to plaintiffs' exhib-

it I and the record, it has a base of operations only in Seneca County, Ohio, where it has maintained one or two asphalt plants over the approximately twenty-five years of its existence prior to the filing of this antitrust action in December 1983 against defendants. Seneca County is located in the extreme southeast corner of the thirteen-county relevant market as determined by the jury at trial.

In its brief in this cause, M & B maintains that over the entire relevant time period, it has bid in six counties. Its chief financial officer and one of its two principal operators, Robert M. Chesebro, however, testified that during the twenty year period up to 1980, it did 95 percent of its work in Seneca County and in adjacent Sandusky County.[5] Throughout, its "base of operations" remained in these two counties.

M & B's plant and an available quarry at Bloomville are very near adjacent Huron and Crawford Counties, outside the thirteen-county area. M & B also bid and did work in Erie, Huron, and Crawford Counties, the latter adjacent to Seneca County to the south and east (Erie County is adjacent and east of Sandusky County). Chesebro testified he "very seldom" operated in Wyandot County. Plaintiffs' map identifying batch plants, stone quarries, and sandpits in the area in question in this litigation reflects that defendants have never had a single plant, quarry or sandpit located in Sandusky and Seneca Counties. It reflects, on the other hand, that during the relevant period there were two independent quarries located in Sandusky County, both available to M & B. There have been three quarries located in Seneca County, two of which were controlled by defendants' primary stone supply competitor,

France Stone, and one belonging to Basic, which was the principal source for M & B until M & B acquired operating control of it in 1984. Chesebro conceded that the three largest quarries in the area of his operation were France, National Lime & Stone, and Sandusky Crushed Stone.

Plaintiffs also have a quarry at Rising Sun, very near both Sandusky and Seneca Counties, and there have been two other independent quarries located just south of the Seneca County line. There were no figures produced showing the sand production in these two counties of base operations of M & B. No sandpits in the two counties are reflected on plaintiffs' exhibit 1. Since early 1984 at least, M & B has had its own supply of stone and sand, and it sells sand and limestone to other contractors. There is simply no proof whatever that defendants control or have any monopoly power over the supply of stone and sand in the area in which M & B operated from 1980 to the date of trial.[6]

The district court, in its jury instructions, presented M & B's alternative contention as to a relevant geographic submarket to be Seneca, Sandusky, Ottowa, Wood, Hancock, and Wyandot Counties, apparently those six counties in which it had submitted bids. There was insufficient evidence in the record to establish defendants' monopoly or attempted monopoly status in such a submarket, or that M & B was a real and active competitor in this submarket or in a two-county submarket during the relevant period. Two examples: (1) defendants had no quarry or sand facility in Seneca, Sandusky, Hancock, and Wyandot Counties in the southeast portion of the thirteen-county alleged relevant market or submarket areas; France and other independents had

---

5. In a deposition, Chesebro stated that this two county area remained "pretty constant." He also stated that "Seneca and Sandusky Counties account for *over* 90 percent of our work." (emphasis added) (referring to the entire relevant period). Defendants' credit officer Uhl testified, without contradiction, that M & B won bids on ODOT work in only three counties over twenty-plus years prior to trial. The amended complaint asserted that M & B "engaged in business as a general paving contractor principally in Seneca, Sandusky, and contiguous counties."

6. M & B's Chesebro testified also that M & B bought very little stone from defendants' quarry at Portage, and only on occasion. M & B bought or obtained few materials from defendants and cannot fairly be characterized as anything but a minor and infrequent customer. Defendants' alleged high stone prices, bringing about an alleged profit squeeze, would therefore seem clearly not to bear on M & B's situation directly, if at all.

eleven quarries in these four counties; (2) plaintiffs and others operated six asphalt plants and defendants operated two in these four counties.

M & B claims that it was competing in a relatively free and open competitive market in its two-county area from 1966 to 1970. In those five years it earned, without control of any quarry or stone source, an average of less than $16,000 a year. During the years 1980 through 1986, for which it seeks damages for alleged anticompetitive conduct, it earned an average of *over* $16,000 in actual profits a year. Five of the six years after 1979 were profitable, and there was an increase in profit each year from 1982 through 1985. The loss year, 1981, when revenues were abnormally low, was due, in part, to the bankruptcy of a large contractor customer. In 1981, plaintiffs' exhibit 152AA reflects that M & B claimed damages of over $124,000 in 1981 because it suffered a loss instead of realizing the same 2.7 percent of pretax profit it realized on much lower revenues in the 1966–70 period. This loss is not explained in any fashion by M & B, and it defies reason and logic to assume that its entire 1981 loss, almost $77,000, plus another claimed amount of $47,000, was attributable somehow to defendants' low bidding practices in the southeast part of the thirteen-county area claimed by plaintiffs to be the relevant market.

The proof in this case demonstrates, moreover, that on several state asphalt paving jobs since 1980 in which M & B was the *only* bidder, it claims to have lost money. Chesebro also admitted that his company "always lost money on state work." It would seem illogical and unreasonable, then, to blame defendants for continuing losses on state turnpike work after 1980 under these circumstances, particularly in light of the fact that M & B has had, since 1984, its own source of stone and sand entirely independent of defendants' sources which are located outside of the area in which M & B does from 90 percent to 95

percent of its work and has its base of operations.

It does not carry the day on the issue of proving a relevant market within the thirteen-county area of northwest Ohio for M & B to argue that it is a "potential" competitor in the majority of the thirteen counties in which it has not operated at all for some thirty years of its existence at the time of the trial. M & B, as pointed out, has done work and has been an actual competitor with defendants, both before and after 1980, in basically only two counties. Contrary to M & B's assertions, we believe *City of Cleveland v. Cleveland Electric Illuminating Company*, 734 F.2d 1157, 1166–67 (6th Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), is of no comfort to M & B's contention about the proper relevant market in this case. The market selected must "both 'correspond to the *commercial realities'* of the industry and be *economically significant."* *Id.* at 1167 (quoting from *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962)) (emphasis added). The "commercial realities" here indicate strongly that M & B is neither an actual nor potential competitor in defendants' area of service and operation in and beyond the thirteen counties of northwest Ohio. Like the plaintiff in *City of Cleveland*, M & B presented no evidence that it planned to compete for business outside of Seneca and Sandusky Counties and areas immediately adjacent thereto.

The evidence is also undisputed that during the period from 1980 on there came about *increased* competition in the immediate area of concern to M & B in the form of additional, substantial competitors in the marketplace for asphalt paving. M & B had little actual competition with Price Construction Co. when its assets were acquired in 1969 by defendants.[7] The elimination of Price and defendants' acquisition of Ohio Engineering Co. were more than offset by the emergence of Miller and Gerken as serious competitors in the area. Erie

---

7. Price did not sell its sand business to defendants; instead, defendants agreed to continue buying sand from Price (and others).

Blacktop, another asphalt paving contractor, concededly also came into the M & B "bailiwick"—Seneca and Sandusky Counties—after 1980 from time to time to bid on projects in which M & B was interested. After 1980, in jobs in which M & B and defendants bid, M & B was the successful bidder in four of six projects.

It is not controverted but that M & B's bids on a number of jobs during the relevant period exceeded the State Engineer's estimate for these jobs. It is also not controverted that M & B's proportion of success on bids submitted on ODOT and OTC work in its area of operations did not decrease after 1980 in comparison to earlier periods. There is also no substantial evidence that the number of bidders decreased from 1979 through the time of trial. This would clearly indicate that M & B was not foreclosed, nor were others, from bidding on the asphalt work which is the subject matter of this controversy. It may also indicate that M & B's costs, even after acquiring its own quarry source, are higher than other competitive bidders in the marketplace. This evidence (and other proof in the record) indicates a failure to prove dangerous probability of success of monopolization by defendants in the area in which M & B operated or that competitors were driven from the market even after acquisitions were made by defendants. It does reflect that the real basis of complaint by M & B was the low bids submitted by defendants which plaintiffs characterize as predatory bidding or pricing. It should also be noted that this practice of low and successful bidding by defendants has extended over twenty years in northwest Ohio—some indication that it is not a short-range procedure designed to raise prices later, as indicated by plaintiffs' experts.

With respect to M & B's claims, we deem it appropriate to note the recent comments of another court which dealt with § 2 antitrust claims:

The "dangerous probability" element of the attempted monopolization offense reflects the well-established notion that section 2 of the Sherman Act governs single-firm conduct only when it threatens actual monopolization. *Copperweld*

*Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628 (1984). The Sherman Act protects competition, not competitors, and does not reach conduct that is only unfair, impolite, or unethical. *United States v. American Airlines, Inc.*, 743 F.2d 1114, 1119 (5th Cir.1984), *cert. dismissed*, 474 U.S. 1001, 106 S.Ct. 420, 88 L.Ed.2d 370 (1985). As we recently emphasized in *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325 (7th Cir.1986),

"[c]ompetition is a ruthless process. A firm that reduces costs and expands sales injures rivals—sometimes fatally. The firm that slashes costs the most captures the greatest sales and inflicts the greatest injury. The deeper the injury to rivals, the greater the potential benefit. These injuries to rivals are by-products of vigorous competition, and the antitrust laws are not balm for rivals' wounds."

*Id.* at 1338.

This is not to say that injury to rival firms cannot ever lead to injury to consumers and that section 2 of the Sherman Act cannot be used to prevent such injury. But section 2

"must be used with the greatest caution. Action that injures rivals *may* ultimately injure consumers, but it is also perfectly consistent with competition, and to deter aggressive conduct is to deter competition. Thus, the plaintiff faces a stiff burden in any section 2 litigation. 'It is not enough that a single firm appears to restrain trade unreasonably, for even a vigorous competitor may leave that impression. For instance, an efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result. This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster. In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scruti-

ny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.' "

*Id.* (quoting *Copperweld Corp. v. Independence Tube Cob,* 467 U.S. 752, 767–68, 104 S.Ct. 2731, 2739–40, 81 L.Ed.2d 628 (1984)).

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1413–14 (7th Cir.1989) (footnotes omitted).

In summation, then, we conclude that M & B failed to prove that it was realistically an economically significant competitor or potential competitor in the thirteen-county area claimed to be a relevant market; nor did it establish any claimed submarket in which defendants were shown to be actual or potential monopolists. There was also a failure of proof as to unfair competition or attempted monopoly by defendants in the principal area of operation of M & B. The undisputed material facts do not show that defendants have had a dangerous likelihood of success in the elimination of competition in M & B's area of operations since 1980. On the contrary, M & B has acquired control of a quarry site and has enjoyed increasing profits over the last four years for which proof was available through 1986. M & B did not show that it ever depended upon defendants as a significant source of sand or asphalt stone or other asphalt components, or that defendants discriminated against it in pricing products or in not affording it competitive discounts. Defendants, indeed, had no quarry or sand source in the primary area of M & B's operations—Seneca or Sandusky County. M & B cannot reasonably claim the benefit of the testimony of plaintiffs' experts that defendants' alleged "excessive profits on the stone level" worked a price squeeze on M & B. The primary evidence submitted by M & B, on the other hand, was the same type of predatory pricing evidence which was relied upon by Langenderfer in its original trial against defendants and found by this court to be insufficient in *Langenderfer I,* 729 F.2d 1050, to establish a cause of action as a matter of law under § 2 of

the Sherman Act. M & B's attorney, in his closing statement to the jury, asked for "$339,000 in damages for profits lost." The jury awarded M & B $350,000 in damages.

Under these circumstances, we must REVERSE the award pursuant to the jury verdict rendered to M & B. It follows that the award of attorneys fees and costs, based upon the judgment for M & B as a prevailing party, must also be reversed and set aside. M & B, of course, is therefore entitled to no injunctive or equitable relief.

## IV. SADER CLAIM

■ The jury found in favor of Sader but answered specific interrogatories to the effect that there was no relevant market proved as to this plaintiff consisting of limestone, sand, or asphalt used in ODOT and OTC asphalt paving contracts as in the case of the other plaintiffs. The jury also answered interrogatories indicating that there was no relevant market proved as to Sader consisting of either ODOT or OTC asphalt paving contracts. The jury responded, however, that there was "a relevant geographic market or submarket for Sader," and determined that market to be the thirteen counties located in northwest Ohio. The jury found that acquisitions made by defendants were "all made to exclude & /or injure competition and increase Johnson's power," and that anticompetitive conduct caused injury to Sader in the amount of $250,000. In his final closing argument, Sader's attorney asked the jury for damages in the amount of $224,500.

Defendants argue on appeal that "Sader is neither a consumer nor a competitor in the relevant markets alleged." Defendants' Brief at 45. Gregory M. Sader, principal owner and officer of Sader since 1962, testified that he operates a small paving and excavating business (9 employees) headquartered in Bowling Green, Wood County, Ohio, located in the north central part of the thirteen-county area in controversy. Sader is not ODOT "qualified," and cannot bid on ODOT or OTC asphalt paving

contracts, although Sader does subcontracting on ODOT work. Defendants further argue that Sader failed to prove monopoly or attempted monopoly in "the markets in which Sader competes."

The brief filed on Sader's behalf responds that the issue in the case was whether "defendants' refusal to deal with Sader was for 'valid business reasons' or whether it was unreasonable anticompetitive conduct as Sader contended." Sader argues that this was properly a jury issue. Sader concedes it owned no quarry nor any asphalt plant, but asserts it depended on defendants for "stone, sand and asphalt at Bowling Green." Contending that it is irrelevant that it did not compete in the ODOT/OTC markets against defendants, Sader suggests that it was a "potential ODOT, OTC competitor that was foreclosed."

A number of factors with respect to Sader, as in the case of plaintiff M & B, would weigh strongly against any suggestion that Sader was, in reality, a potential competitor in the ODOT/OTC market. At the time Sader filed the complaint against defendants, it had been in business in the Bowling Green area for more than twenty years; by the time of trial, more than twenty-five years. It had never seriously sought to compete in the ODOT/OTC market which was the basis of the original monopolization complaint in this case. Sader, moreover, never indicated that it intended to compete with defendants beyond nearby Wood County, and the district court instructed the jury that Sader claimed a relevant submarket of Bowling Green, Wood County, and southern Lucas County.[8] Sader testified that his operation grew during the 1960s despite defendant Johnson's acquisition of Wood County Stone Company,

his principal quarry source, in 1961. (An independent operation, Urbana, had maintained a hot mix plant at this site from which Sader acquired asphalt "product" at the time.)[9] Stone was still made available to Sader at this nearby Portage quarry by defendants, but without the volume discount previously granted by Wood from and before 1960. (For a further discussion of Portage quarry costs and prices, see Part V, *infra.*) Sader testified that the "biggest majority" of his work was always in Wood and adjacent Lucas County (Toledo) with "emphasis" in Bowling Green. In the 1960s, defendants' OAMCO facility at Portage and their Maumee Stone site became Sader's chief suppliers, but not of sand. Like many other asphalt pavers, Sader trucked sand in from outside the thirteen-county area. Plaintiff MacRitchie Materials had a quarry at West Millgrove some 15 to 20 miles away from construction sites in and around Bowling Green. (Plaintiff also had a batch plant 15 miles away from Bowling Green at Waterville, and France had a quarry there and another about the same distance at Custor, the latter variously estimated at 15 to 17 miles from Bowling Green.)[10]

Sader testified that during the 1960s and 1970s, defendants began to exert pressures on him in bidding "in his area." Sader also trucked sand for the Creager Company, which was in financial difficulty when acquired by defendants in 1971. We attribute little significance to the Creager acquisition[11] insofar as it relates to Sader, who summarized his complaint about defendants generally by observing, "Johnson just blocked us basically from growing on a normal, healthy business way" during the late sixties and seventies. He also testi-

---

**8.** Sader stated that in recent years 90 percent of his work was in Wood County and areas of nearby Lucas County. In earlier years he did work within and without the wider thirteen-county area, but again mostly in Wood County.

**9.** Urbana moved this plant away at the expiration of its lease. Sader testified that its superintendent later was employed by defendants. Wood's plant and equipment were taken over by Portage in 1964 or 1965.

**10.** In cross-examining defendants' expert, Dr. Myslinski, Sader's counsel referred to Pugh and West Millgrove quarries as being 12 to 15 miles away from Bowling Green.

**11.** Apparently, defendants continued to operate Creager after acquisition as a non-union facility in contrast to its other facilities. Sader complained this gave an advantage to defendants, but this has nothing to do with anticompetitive conduct.

fied, moreover, that the plaintiff experienced difficulty in scheduling delivery of materials from defendants. In 1977, Sader complained personally to Kirkby about scheduling problems: "Ted said he would look into it, and see if he could not get it straightened out" but the problem allegedly continued.[12] Sader also encountered difficulties in scheduling rental trucks at times.

Sader complained about defendants' hot asphalt prices and the fact that, as with stone, they would not give him discounts on this product. Sader also said that plans he had with others in his same situation to set up an asphalt plant were discouraged by a threat that defendants "would not be able to supply our stone needs." Sader said he "pursued the plan" but never carried it out. (Each of the four or five quarries located in or very near the boundaries of Wood County had an asphalt plant operating at the quarry—this included the defendants' quarry at Portage.) Sader said that the planned source of stone was defendants' quarry at Maumee in Lucas County, more distant from Bowling Green than at least four other quarries which Sader characterized as not being "economically" located for his purposes.[13] He added that defendants' representatives in 1977 and 1978 were pressing for more asphalt business from him. He also claimed that defendants refused in 1977 or 1978 to allow him "to set up [a pugmill for a Perrysburg job] on the Lime City quarry site." Instead, he set it up at a nearby France quarry and he bought 25,000 tons of stone from France instead of defendants.

There is no doubt, however, that Sader's primary complaint, and the only one which we are persuaded has arguable merit, is its claim that it was cut off from buying materials because of cooperation with plaintiffs in pursuit of their claims at the first trial, Sader avers that at or about the time he agreed to give a deposition in that proceeding in 1979, defendants' credit representative called on him and told him he expected a check on Sader's account, and Sader agreed to pay it within a month. Sader asserts that he paid the bill of about $13,000, which he conceded was three months overdue.[14] Sader attributes to his 1980 testimony for plaintiffs a much lower than expected Johnson bid on a Bowling Green job which he subsequently lost. (He also claims that Johnson improperly used information he gave to them on this job to underbid him, Sader understanding at the time that Johnson would not bid on this job.)

Later, in 1980, Johnson "made special credit arrangements" for Sader, limiting his credit to $10,000 because Sader was persistently "slow pay." It was during this time that another dispute about credit arose between Sader and defendants. Sader also had been severely restricted in credit extended during 1982. Sader's version of a major dispute is that defendants furnished him defective asphalt for a large private driveway Sader installed and that the customer balked at paying him for the job. Defendants denied that the asphalt was defective and suggested testing the contested product. Sader held up any payment on his total account despite the fact that the driveway job in dispute involved only approximately $4,000. A lawsuit in an Ohio state court developed over this controversy, and Sader finally paid the $4,000

12. Sader admitted that most other "smaller pavers that worked the area was [sic] having the same problems with scheduling." Sader was thus not singled out or treated discriminatorily in that regard.

13. Sader conceded that he bought "very little" stone from Maumee.

14. A monthly bill on August 31, 1979 (Exhibit 9M) revealed that Sader owed Maumee Stone Co. nearly $47,000, a considerable part of which was at least 30 days old, and that in early September, Sader paid some $11,000 on this bill; Sader satisfied this account the following month, mid-October. Early in 1980, Sader's account reflected over $26,000 past due (up to 90 days) and he was warned, per telephone, that the "account is in serious condition and because of the status credit privileges have been removed." (Exhibit BP.) In fact, credit limits of $10,000 were later imposed. In 1982, credit privileges were again suspended for delinquent accounts. In March of 1980, by notice, France also advised Sader that its "account is seriously overdue," and his credit privileges were apparently withdrawn at a France quarry.

pursuant to a court order. Indeed, defendants employed lawyers in three different locations to handle commercial disputes and collections with Sader since 1980.

There is abundant, uncontroverted evidence in written communications from defendants to Sader that his accounts were consistently overdue in the 1979 to 1983 period, and that from time to time credit privileges during this period were withdrawn by defendants. During the same period, evidence reflects that France also suspended credit privileges for Sader in 1980 after numerous warnings; that American Asphalt products in Sylvania, Ohio, turned the Sader account over to attorneys for collection (again, after numerous warnings concerning an account of $2,200 in 1983); that an insurance agency was forced to threaten suit against Sader in early 1984 to collect an insurance account exceeding $15,000 more than 120 days delinquent. Many other witnesses testified that Sader was slow or delinquent in payment of its accounts during the period, although their companies did not cut him off. There is also clear evidence that defendants, during the relevant period, placed other of its customers, whose credit or financial condition was doubtful, on a cash basis for sale of its products. In short, the record establishes that a number of other persons with a contractual relationship with Sader had serious problems with Sader's failure to pay its accounts and either threatened or litigated with Sader concerning a past due balance, and that defendants cut off credit to others in similar "slow pay" circumstances.

■ It appears clear in this case that the problems between Sader and defendant in the relevant period arose out of commercial and credit controversies and did not arise in an antitrust context. That Sader may have been forced in some instances by credit restrictions to obtain asphalt materials from a source 15 to 17 miles further away than a defendant source is not a sufficient basis for this § 2 Sherman Act claim.

In overruling defendants' motion j.n.o.v. following the verdict for Sader, the district court cited *Byars v. Bluff City News Co.,*

*Inc.,* 609 F.2d 843 (6th Cir.1979), as authority. *Byars* is pertinent only with respect to its discussion of refusal to deal by a monopolist. *Id.* at 854. It was uncontroverted in that case that defendant Bluff City refused to deal on any basis with Byars, a competitor in the concededly relevant Memphis area market, in "primary life" magazines and periodicals. *Byars* recognized the general rule—"there exists no duty to deal, so long as the determination is made unilaterally." *Id.* Furthermore, "[e]ven the use of unfair business practices as part of the termination may not invoke sanction under the antitrust laws." *Id.* at 855. A monopolist, however, may be held to different standards, *Id.* at 855, citing *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), where Kodak provided no "independent business reason for its refusal to deal" and "Kodak had monopoly power over the national wholesale market." In *Byars,* we concluded that a refusal to deal practice should be condemned only if it is "unreasonably anticompetitive." 609 F.2d at 860. Even a "refusal to deal designed to accomplish vertical integration, without more, should not be a basis for imposing liability" upon a purported monopolist. *Id.* at 861. We observed further that courts should examine business reasons for a refusal to deal, and "must give them some leeway in making business decisions." *Id.* at 862.

Sader's brief not only cites *Eastman Kodak Co., supra,* and *Byars,* but also *Riverview Investments v. Ottawa Community Improvement Corp.,* 769 F.2d 324, 328 (6th Cir.) ("what matters is that freedom to compete is restrained"), *revised,* 774 F.2d 162 (6th Cir.1985). We do not construe *Riverview Investments,* a combination or security case, as pertinent to the refusal to deal aspect of this case. *Kerasotes Michigan Theatres v. National Amusements, Inc.,* 854 F.2d 135 (6th Cir.1988), also cited by Sader, was principally concerned with "leveraging" or misuse of monopoly power in one market to exclude a competitor from another market. We deem *Kerasotes* to have minimal relevance to Sader's claims. *United States v. Griffith,* 334 U.S. 100, 68

S.Ct. 941, 92 L.Ed. 1236 (1948), mentioned by Sader in a footnote, is also, like *Kerasotes*, a theater and film case concerned with defendants who pooled their powers to exclude others from obtaining films for exhibition. None of these authorities is helpful to Sader here.

We conclude from a careful examination of the record in this case that there is insufficient evidence to sustain Sader's charge that defendants began to press him on payment of his past due account only when he agreed to give a deposition in this case in 1979 to Langenderfer.[15] We conclude also that there is insufficient evidence to support an antitrust claim of tying defendants' imposition of limits and restraints upon Sader's credit during 1980 through 1983 to his part in Langenderfer's suit. Essentially, it seems clear that defendants and Sader were engaged in a series of commercial disputes concerning his accounts, scheduling of pick-ups at defendants' facilities, and whether or not defendants were carrying out alleged credit understandings with Sader. The claim of refusal to deal is inextricably bound with the commercial and contract disputes between the parties, and was not proven to be a practice related to antitrust conduct.

There was, moreover, similar to the M & B situation already considered, a failure by Sader to prove a relevant market in which Sader established the necessary essentials, including causation, under a § 2 Sherman Act claim. The physical location of alternative sources of stone and asphalt and other asphalt components to Sader's basic operations in Wood County and immediately adjacent areas might alone preclude any recovery of damages for antitrust injury in this case by Sader. There was also evidence of a number of competitors in the area. "The § 2 market definition looks to the existence of competitors as evidence of countervailing power which would preclude monopolization." *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum*, 579 F.2d 20, 27 n. 11 (3rd Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). This plaintiff has essentially relied upon contentions of predatory or unfair low bidding by defendants on jobs in which he was interested, a basis we determined in *Langenderfer I* to be insufficient to support a damages claim for antitrust injury absent a showing that defendants' bids were below their total average costs.

There is insufficient proof in this record to show that defendants had a monopoly position, attempted a monopoly and had a dangerous probability of success in this regard, in the limited non-OTC, non-ODOT market in which Sader was involved. The vast weight of proof submitted by plaintiffs, upon which their experts relied, bore upon defendants' OTC and ODOT market share in a *thirteen*-county area. Sader was not a party who realistically competed in that market.

We are not satisfied from the proof adduced, after careful examination of the record, even if we assume the jury found that defendants cut Sader off from supplies at Portage in 1983 when suit was filed, that Sader established that this action was effected by an actual monopolist or one that threatened a realistic danger in the area of Sader's business activity in a relevant market.[16]

> The ultimate inquiry in any attempted monopolization case remains whether the defendant has or reasonably might come close to having the ability to control total market output and prices.

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989).

---

**15.** Sader, upon cross examination, stated that he did not believe that his credit had been suspended in 1979 or 1980 when his deposition was taken and the first trial took place. He added that he would not have a problem if defendants "treated me like they treated everybody else" in credit matters. He conceded, however, that he had credit problems with defendants as early as 1978 and that this continued into 1983.

**16.** Being "cut off" meant essentially that Sader was required to pay cash rather than rely on credit for certain periods of time. Sader was placed on a "permanent job basis" by defendants, after a number of revocations and reinstatements of credit, in August 1983.

Defendants may be held liable to Sader only if proven to have refused to deal with him for anticompetitive reasons as a monopolist or attempted monopolist in some established relevant market. Without objection by plaintiffs the district court instructed the jury that plaintiffs claimed the existence of three "appropriate relevant product markets"—stone, sand, and asphalt—"used on ODOT and OTC paving contracts" and "bidding on a performance of paving contracts awarded to prime contractors by ODOT and OTC." None of these claimed relevant markets were proved with respect to the defendants as to the limited geographic area in which Sader was operating, and certainly not so with respect to monopolization as to sand and stone. No reasonable jury could find, on the evidence presented, that Sader was "cut off" at Portage or that defendants refused to sell stone to Sader based on an attempted monopoly.

We observe similarities between this case and *Trace X Chemical v. Canadian Industries,* 738 F.2d 261 (8th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). Plaintiff Trace X, like Sader, claimed that defendant had misused monopoly power to refuse to deal with it and had refused it credit.

> On the basis of the evidence presented, CIL's refusal to extend credit did not amount to unreasonable anti-competitive conduct, but rather constituted a valid exercise of business judgment. It is certainly not conduct that is "possible or effective only if taken by a firm that dominates its smaller rivals." *Berkey Photo* [*Co., Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979)] at 275.
>
> In support of its claim of anti-competitive conduct, Trace X argues that CIL threatened to discontinue supplying it with TNT unless Trace X paid for the $160,000 worth of TNT received but not paid for by Trace X. However, terminating or threatening to terminate deliveries to a purchaser who refuses to provide full payment is not predatory or unlawful anti-competitive conduct. *Fairdale Farms, Inc. v. Yankee Milk, Inc.,* 715 F.2d 30, 34 (2d Cir.1983), *cert. denied,*

464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 174 (1984).

> This case does not involve a refusal to deal. CIL was willing to continue to supply Trace X with TNT; it merely refused to deal with Trace X on other than a cash basis. "Section 2 of the Sherman Act does not give purchasers the exclusive right to dictate the terms on which they will deal," *Fairdale Farms,* 715 F.2d at 34, nor does it require a monopolist to accede to every demand of its competitors or customers. *Glen Eden Hospital v. Blue Cross & Blue Shield,* 555 F.Supp. 337, 345 (E.D.Mich.1983).

738 F.2d at 266–67 (footnote and citations omitted).

As did the defendant in *Trace X,* defendants here merely insisted on current payment and exercised "business judgment" and insisted on a "cash basis" method of doing business. As did the Eighth Circuit in *Trace X,* we likewise reverse the jury verdict rendered for Sader, and we note also that some evidence of anticompetitive conduct was present in *Trace X.*

For all these reasons then, (1) failure of proof concerning a relevant market and reasonably consequential damages; (2) failure to show defendants' monopoly position in asphalt, stone or sand in the principal area of Sader's operations during the period in question; (3) because the essential character of Sader's charges was related to ordinary commercial disputes rather than anticompetitive conduct; and (4) because a principal basis of Sader's proof of anticompetitive conduct was on predatory bid pricing, we must REVERSE and set aside the verdict for Sader. It again follows that the award of attorney fees and costs, based upon services rendered to Sader, must be reversed as well. Sader is entitled to no injunctive relief.

## V. *MacRITCHIE MATERIALS, INC. CLAIM*

■ The plaintiffs' amended complaint sets out that MacRitchie has offices in West Millgrove where it operates a limestone quarry "which supplies stone and

sand to Langenderfer, NOAP and other asphalt producers." Members of the "MacRitchie family" are "principal shareholders" of Langenderfer, NOAP, and MacRitchie. Plaintiffs' exhibit 1 shows its quarry, and the adjacent asphalt plant operated by Langenderfer or NOAP. MacRitchie's claim was not considered in the first trial pursued by Langenderfer and NOAP. Defendants never bought stone or sand from MacRitchie, which claims injury and loss by reason of defendants' claimed monopolistic practices, which caused it to lose business and sales to related plaintiffs and others.

Defendants assert that they do not possess monopoly power in limestone as a matter of law because of their market share of stone in the thirteen-county market. They also respond to MacRitchie's claim by contending that it is a claim of "indirect and remote" injury not caused by its conduct, even if that conduct were deemed to be anticompetitive. Finally, defendants assert that MacRitchie's claim is speculative and "unsupported by the testimony."

We note at the outset that the MacRitchie quarry is situated nearer, or as near, to southeastern Wood County, to Seneca County, to Wyandot County, to eastern Hancock County, and to southern Sandusky County, than any of defendants' quarries. The entire southeast quarter of the thirteen-county area is better served by MacRitchie's quarry, or by independent stone producers including France, the largest limestone operation in the entire relevant market claimed by plaintiffs, than by defendants' quarries. Defendants' nearest operating quarry, at Portage, also in Wood County, was located about ten miles northwest of MacRitchie's West Millgrove quarry. From 1971 through 1975, Portage had the highest comparative quarry costs of all of defendants' quarries, and only defendants' Rocky Ridge quarry exceeded its costs in 1976. Portage's average cost of stone was the highest of defendants' quarries analyzed by plaintiffs from 1982 to 1985.[17] Consistently throughout the 1981 to 1985 period, Portage and Rocky Ridge, defendants' nearest quarries to MacRitchie's, had the lowest gross margins of profit of defendants' quarries analyzed by plaintiffs, measured by the difference between average price and cost per ton. Defendants suffered by far their lowest operating income (measured by percent of pre-tax income from their quarry operations) from 1980 through 1982. Defendants' after-tax return on net worth based on stone operations was considerably reduced from 1980 through 1983, but returned to more normal levels in 1984 and 1985. MacRitchie, then, had every opportunity to be competitive with defendants in its quarry and limestone operations.

It is evident from the analysis of this data that defendants' quarry at Portage, the one which serves as the nearest competitor to MacRitchie's quarry, has relatively high costs of production and is less profitable than other quarries operated by defendants. It is also evident that MacRitchie's geographic location is superior to that of any of defendants' quarries in much of the southeast quadrant of the relevant market area. There are a number of highway asphalt pavement competitors located within twenty or twenty-five miles of MacRitchie's quarry.

An examination of limestone production of defendants and others within the thirteen-county relevant market area, including MacRitchie, from 1979 to 1986 was made by plaintiffs (exhibit 21A) and indicates as follows (in millions of tons):

| DEFENDANTS | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Defendants | 2.116 | 2.310 | 1.592 | 1.384 | .982 | 1.136 | 1.159 | 10.679 |
| France | 3.515 | 2.849 | 2.164 | 1.502 | 2.513 | 2.334 | 2.602 | 17.479 |
| Nat'l Lime | 1.033 | .857 | .734 | .739 | .719 | .899 | 1.076 | 6.057 |
| Basic | .349 | .305 | .156 | .157 | .063 | — | — | 1.030 |

17. Rocky Ridge quarry, owned by defendants, slightly exceeded Portage's costs in 1983. Portage reflected no cost data in 1984, and its costs exceeded its average sales price in 1982.

| MacRitchie | .187 | .232 | .103 | .111 | .159 | .126 | .172 | 1.090 |
|---|---|---|---|---|---|---|---|---|
| Others | 2.222 | 1.702 | 1.301 | .836 | 1.647 | 1.094 | 1.205 | 9.007 |
| 13 County Total: | 9.422 | 8.255 | 6.050 | 4.729 | 5.083 | 5.589 | 6.224 | 45.342 |
| Mich. Stone | .815 | .566 | .295 | .277 | .448 | .582 | .362 | 3.345 |
| TOTAL: | 10.237 | 8.821 | 6.345 | 5.006 | 5.531 | 6.171 | 6.576 | 48.687 |

Plaintiffs' exhibit 21A.

---

Michigan Stone is located outside the thirteen-county area in Michigan. Plaintiffs assert that because much of its production goes into the thirteen-county relevant market area, it should be considered as defendants' facility within the area. The percentage of road material furnished to the total market by defendants, by France, and by others (including MacRitchie) is reflected below. The figures in parentheses are arrived at by computing Michigan Stone's production into defendants' (and the market's) total:

| YEAR: | DEFENDANTS: | FRANCE: | OTHERS *: |
|---|---|---|---|
| 1979 | 22.5% (28.6%) | 37.3% (34.3%) | 40.2% |
| 1980 | 28.0% (32.6%) | 34.5% (32.3%) | 37.5% |
| 1981 | 26.3% (29.7%) | 35.8% (34.1%) | 37.9% |
| 1982 | 29.3% (33.2%) | 31.8% (30.0%) | 39.0% |
| 1983 | 19.3% (25.9%) | 49.4% (45.4%) | 31.2% |
| 1984 | 20.3% (27.8%) | 41.8% (37.8%) | 37.9% |
| 1985 | 18.7% (23.1%) | 41.9% (39.6%) | 39.5% |
| Avg. 7 yrs. | 23.6% (28.8%) | 38.5% (35.9%) | 38.0% |

* Because all percentage figures have been rounded off to the nearest tenth, the figures across each row may not equal exactly 100 percent.

---

We doubt that it is proper for statistical purposes to include Michigan Stone's production/sales to the thirteen-county area, as is contended by plaintiffs. The more appropriate data would be the production of defendants' quarries in northwest Ohio, not including the Michigan facility. Including Michigan Stone's production, but excluding any other producers outside the thirteen-county area, skews the statistics in plaintiffs' favor.

The data reflects that after acquisition of all its quarries in the thirteen-county area, the last of which occurred in 1970, defendants from 1979 to 1985 (the period in which MacRitchie is involved as a plaintiff) controlled, on the average, 23.6 percent of the road material limestone in the relevant market alleged by plaintiffs. From 1983 through 1985, defendants controlled less than 20 percent. France, the largest factor in the road material limestone market, controlled, on the average, nearly 36 percent of the market between 1979 and 1985. In the last three years of that period, France controlled, on the average, 44.4 percent of the market. Even if we include the production of Michigan Stone with the defendants' Ohio quarries for purposes of calculating defendants' market share, we find that defendants averaged less than 29 percent of the applicable highway limestone during the 1979–1985 period while France averaged about 36 percent. It may be readily observed that during the latter part of the seven year period, reflected in the table, defendants' share of the total limestone market decreased, particularly in comparison to France's share.

The limestone market share of defendants was, at most, around thirty percent and decreasing. Plaintiffs have cited no authority indicating that this meets Sherman Act § 2 requirements. There is no substantial evidence that defendants were capable of, much less achieved, the destruction of competition in limestone in any relevant market.

To prove its claim of attempted monopolization, [plaintiff] has to prove that [defendant] had engaged in anticompetitive conduct with the specific intent to monopolize and that the attempt had a dangerous probability of success. *United States v. Dairymen, Inc.*, 660 F.2d 192, 194 (6th Cir.1981).

Anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor. Lively legal competition will result in the efficient and shrewd businessman routing the inefficient and imprudent from the field. The antitrust laws must be administered in such a way that they do not restrain such vigorous competition in order to protect inefficient competitors. As Judge Learned Hand has pointed out, "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Company of America*, 148 F.2d 416, 430 (2d Cir.1945). Merely to attempt to succeed in business is not anticompetitive conduct.

*Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 823 (6th Cir. 1982).

In *Richter*, we considered market share and "dangerous probability of success" in attempted monopolization, observing:

The third element of attempted monopolization is a dangerous probability of success. The greater a firm's market power the greater the probability of successful monopolization. In order to be found liable for attempted monopolization, a firm must possess market strength that approaches monopoly power—*the ability to control prices and exclude competition.*

Market strength is often indicated by market share. During the relevant period, [defendant]'s market share declined from approximately 40% to approximately 30%. Given the facts of the case, such a share is not sufficient to establish [defendant]'s capacity to monopolize. *See United States v. Empire Gas Corp.*, 537 F.2d 296 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (50% market share does not establish dangerous probability of success); *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) (30% market share is not enough). The fact that [defendant]'s share of the market was declining also belies whatever inference of capacity to monopolize that may be drawn from the size of its market share. *Forro Precision, Inc. v. International Business Machines Corp.*, 673 F.2d 1045, 1058 (9th Cir.1982); *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980).

691 F.2d at 826 (emphasis added).

"Dangerous probability of success" is but one of the elements of a Sherman Act § 2 claim that must be proved by MacRitchie in order to succeed:

The offense of attempt to monopolize (Sherman Act § 2) is composed of the following elements:

1. Specific intent to monopolize;
2. Anti-competitive conduct;
3. A dangerous probability of success.

*Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951). *Accord, Richter Concrete Corp. v. Hilltop Concrete Corp.*, *supra*, 691 F.2d at 823; *United States v. Dairymen, Inc.*, *supra*, 660 F.2d at 194; *Northeastern Telephone Co. v. American Tel. & Tel.*, 651 F.2d 76, 85 (2d Cir.1981). Monopolization is the market power to control prices or exclude competition. *United States v. Griffith*, 334

U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). Specific intent to monopolize may be inferred from evidence of anticompetitive conduct, *Lorain Journal, supra*, but not from legitimate business practices aimed only at succeeding in competition. *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953).

*White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 506–07 (6th Cir.1983).

We reversed as "untenable" the district court's holding in *White & White* that a 25 percent market share[18] coupled with a finding of "leverage" and "link" practices satisfied the "dangerous probability of success" requirement. *Id.* at 508 (citing *Richter Concrete, supra*, and *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982)).

Other courts have reached the same result as in *Richter* and *White & White* in situations where a defendant charged with a Sherman Act violation had market shares larger than defendants have in this case (with respect to limestone). In *United States v. Empire Gas Corp.*, 537 F.2d 296 (8th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977), a 47 percent–50 percent share in LP gas in a relevant market was held to be insufficient. In *Lektro–Vend*, a 30 percent or more market share was found insufficient as a matter of law. In *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832 (2d Cir.1980), a market share range of from 54.5 percent to 33 percent was determined to be insufficient. Similarly, in *Levitch v. Columbia Broadcasting System*, 495 F.Supp. 649 (S.D.N.Y.1980), a 33 percent maximum market share was held insufficient. Judgment for the defendant, which had a 34–38 percent market share, charged with anticompetitive conduct and antitrust violations, was affirmed because there was no dangerous probability of success of monopolization in *Shoppin' Bag of Pueblo v.*

*Dillon Companies*, 783 F.2d 159 (10th Cir. 1986). Even when plaintiff asserted that an alleged § 2 antitrust violator possessed a 65 percent market share, the court in *Hunt–Wesson Foods v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981), found only that "this may provide a basis for inferring that Ragu possessed monopoly power … [and] sufficient to withstand a motion to dismiss."

We adhere to the views of Areeda & Hovenkamp, *Antitrust Law*, § 519.3 (1989 Supp.) that it would be rare indeed to find that a firm with only 25 percent or 50 percent of the market could control price over any significant period. "The monopolization offense is concerned with single firm conduct maintaining or expanding the economic power of a firm that is already a monopolist." *Id.*

There was no allegation by plaintiffs, no contention made, that defendants conspired with France with respect to monopolizing or attempting to monopolize the limestone market. Nor could there have been, since the evidence was that these entities were in direct competition, and the record showed that France was acquiring a greater market share during the later years despite defendants' acquisitions of quarries in the 1960s.

■ Plaintiffs introduced evidence at trial that combined the market shares of defendants and France, ostensibly in order to demonstrate market structure. Plaintiffs cite no authority in support of their theory and contention that they may combine the larger independent competitor France's limestone market share with defendants' share in order to establish the dangerous probability of success requirement. The fact that the prices and discount practices of these two substantial competitors may be similar is not evidence that they acted in conspiracy or concert to exclude competition, to control prices, or to commit unlawful anticompetitive practices. The testimony of plaintiffs' experts about anticompeti-

---

**18.** Defendants in *White & White* were found to have a market share in various markets of as much as 45 percent and over 30 percent in others.

tive conduct of defendants was mistakenly based upon their assumption that the shares of France and defendants should be taken as combined.

MacRitchie is faced with a perplexing dilemma in that its claim is somewhat at odds with the claims of its fellow plaintiffs. While the other plaintiffs complained of Johnson's low bids on paving jobs, they also complained that Johnson charged them supracompetitive prices for component materials. If this were the case, it would seem to accrue to MacRitchie's advantage as a limestone supplier, rather than to its detriment. Furthermore, as noted, evidence regarding the limestone market fails to demonstrate that Johnson possessed power over prices. Defendant quarries, for instance, granted prompt pay discounts, as did France, but plaintiffs' quarries, a profit resource, did not. MacRitchie bought nothing from defendants and apparently matched the limestone prices at Portage, except as to discount policies which differed. As to the number of limestone quarries for road and highway operators in the relevant area, Burton MacRitchie conceded in his testimony that there were twenty or more quarries and half that many competitors furnishing limestone for roads and highways in the relevant market area, including France and Martin Marietta Corporation.[19] According to Burton MacRitchie (principal officer of MacRitchie), "Portage and our quarry are quite similar in price."

■ As pointed out in *Indiana Grocery, Inc. v. Super Valu Stores*, 864 F.2d 1409, 1413 (7th Cir.1989), § 2 is directed to single firm conduct, whereas § 1 deals with concerted action and proscribes unreasonable restraints through combinations or conspiracies. See *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), for a discussion of the basic distinction between the two:

The conduct of a single firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization. It is not enough that a single firm appears to "restrain trade" unreasonably, for even a vigorous competitor may leave that impression. For instance, an efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result. This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster. In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.

*Id.* at 767–68, 104 S.Ct. at 2739–40 (footnotes omitted). "Concerted activity subject to § 1 is judged more sternly than unilateral activity under § 2." *Id.* at 758, 104 S.Ct. at 2735.

The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals. Coordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition. In the marketplace, such coordination may be necessary if a business enterprise is to compete effectively.

*Id.* at 769, 104 S.Ct. at 2740–41. Nor can activities of and between defendant entities be deemed anything but unilateral conduct, not concerted conduct for purposes of the Sherman Act analysis.

It is not necessary for us to rule on whether MacRitchie's claim for indirect

---

**19.** Martin Marietta was described in an antitrust suit by a sand and gravel operator which dealt in coarse gravel or stone used in construction of roads as "a large, diversified company with holdings in various fields including the produc-

tion of sand and gravel (aggregates). It has aggregates holdings in fifteen states...." *Chillicothe Sand & Gravel v. Martin Marietta Corp.*, 615 F.2d 427, 428 (7th Cir.1980). France is owned by Koppers Corp., a large conglomerate.

damages gives it standing within the allowable parameters of *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir.1983), or *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). It is sufficient for us to note that it is doubtful that MacRitchie has such standing. We note further that during the relevant period, MacRitchie's market share in limestone increased rather than decreased in comparison to that of the defendants. We conclude that MacRitchie has failed to prove that defendants' limestone production share of the relevant market is sufficient, as a matter of law, to constitute a dangerous probability of monopolization. *See United States v. Syufy Enterprises*, 903 F.2d 659 (9th Cir.1990).

In summary, we conclude that MacRitchie has failed to establish his claim against defendants under the Sherman Act. MacRitchie has stated in its brief that "defendants' control of stone, sand and asphalt gave them power over asphalt paving in all markets." MacRitchie has proven no control by defendants over sand in any market; it has proven no dangerous probability of success of monopoly by defendants in road limestone in any relevant market, and MacRitchie's claim of injury by reason of defendants' power over asphalt paving is an indirect claim at best, and must fall by reason of the failure to demonstrate requisite monopoly control by defendants over asphalt paving components. MacRitchie is a competitor of defendants only in limestone for roads and highways, and there is a failure of proof of defendants' monopoly power in this respect. There is no basis in law for attributing France's limestone market share and power to defendants.

For these reasons we must also REVERSE the award pursuant to the jury verdict rendered to MacRitchie.[20] It follows that the award of attorney fees and costs made on behalf of MacRitchie must also be set aside, and that MacRitchie is not entitled to equitable relief.

---

**20.** In closing argument, MacRitchie's attorney claimed basic damages of approximately $188,-745 for MacRitchie; the jury awarded $200,000.

## VI. NOAP CLAIM

■ In the amended complaint NOAP sets out that it is a separate Ohio corporation with offices in West Millgrove, Ohio, the same address of Langenderfer and MacRitchie. It was "engaged in the business of purchasing sand and stone ... called 'highway construction materials,' mixing asphaltic concrete ... and selling the materials and asphaltic concrete to plaintiff Langenderfer" and others. NOAP differs from MacRitchie in that it had no quarry but purchased stone, as well as sand, and resold them after mixing into "asphaltic" materials for road and highway construction. For reasons stated with respect to MacRitchie in part V, we reiterate that plaintiffs have failed to prove that defendants have monopolized or achieved a dangerous probability of success in attempting to monopolize the quarrying, stone, or sand markets in the relevant thirteen-county market area since 1979. For the same reasons stated in part V, NOAP has proved no claim since that date due to defendants' quarrying and sand operations. NOAP is thus entitled to no damages due to these operations for this period of time because of a failure to prove the requisites of a § 2 Sherman Act claim, due primarily to the lack of the required market share of defendants in the relevant market.

We conclude, in short, that defendants have not been shown to have the power at any relevant time to *control* prices or exclude competition in the sand and stone markets. *United States v. duPont*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Southaven Land Co. v. Malone & Hyde*, 715 F.2d 1079, 1087 n. 10 (6th Cir. 1983).

Through 1978, NOAP had four hot-mix plants in the relevant northwest Ohio area as noted in *Langenderfer I*, and we consider the claims of NOAP as an asphalt producer separately from the claims of monopoly or attempted monopoly in stone and sand production.

---

As of March 31, 1985, MacRitchie had an accumulated deficit of $560,000.

Paragraph 18 of the amended complaint charges that defendants "overcharged [plaintiff] for highway production materials from 1980 through 1985" (when the amended complaint was filed), and will in the future. We conclude that the claim for overcharging for stone and sand must fail for the reasons stated. Stone prices of the defendants were generally consistent with the prices of the largest producer, France, and with plaintiff MacRitchie's prices at its quarry at West Millgrove.

Plaintiffs' exhibit No. 144 reflects the following data for the "concrete and road metal" market, 1974–1978, presumably including Michigan Stone's production:

| YEAR: | DEFENDANTS: | FRANCE: | OTHERS: |
| --- | --- | --- | --- |
| 1974 | 24% | 24% | 52% |
| 1975 | 25% | 22% | 53% |
| 1976 | 28% | 32% | 40% |
| 1977 | 24% | 32% | 44% |
| 1978 | 28% | 29% | 43% |

(That same exhibit shows defendants' share of total quarry production for these years to be 17%, 18%, 19%, 18% and 19%, respectively).

It is clear from this data furnished by plaintiffs, even if Michigan Stone's production is included as applicable to the Ohio relevant market (which we conclude distorts the actual relevant market share allocations), that defendants come nowhere near as dominant a market position in stone prior to 1979 as in the years following 1979. This data indicates no dangerous probability of success for any attempted monopolization in this particular area of stone production. With respect to sand production for any pertinent year, plaintiffs have failed in their effort to establish a § 1 or § 2 claim against defendants. To the extent, then, that NOAP's claim of anticompetitive unlawful conduct is based upon monopolization or attempted monopolization of stone and sand, it must fall. There is, again, no basis for combining defendants' stone production or market share of "concrete and road metal" from their quarries with that of their principal competitor, France. Plaintiffs have alleged

no conspiracy between defendants and France and merely point to a similarity of prices for quarries that are in the same general area. NOAP has always had available to it, moreover, the stone quarry at West Millgrove, which is nearer a three or four county area within the northwest Ohio relevant market claimed by plaintiffs than any quarry of defendants.[21]

Burton MacRitchie, chief operating officer of both NOAP and Langenderfer, testified that in 1976 he considered that there were eight major paving competitors in the relevant market area.[22] NOAP claimed that it occasionally received discounts on stone bought from quarries later acquired by defendants, but never received such discounts after defendants acquired them. However, MacRitchie conceded that "the prices did not make a drastic change" after the acquisitions. Neither France nor defendants allowed volume discounts but did give prompt pay discounts. Plaintiffs' discount policy was apparently just the opposite. When defendants acquired a sand facility, the same discount price policy ap-

21. Burton MacRitchie testified that his company, NOAP, and/or other MacRitchie family enterprises, operated an asphalt batch plant at the West Millgrove quarry from 1960 to 1980. He purchased stone and manufactured sand from France. He testified that he only occasionally obtained sand from defendants. Mr. MacRitchie testified also that MATCO was to the S.E. Johnson Co. as NOAP was to Langenderfer, both producing asphalt utilized by their paving companies.

22. Burton MacRitchie conceded that there were a number of independent sand producers in Wyandot County serving the south and east part of the relevant market area and others in Indiana and Michigan serving the western and northern portions.

plied.[23] Plaintiffs contend that Union Quarries at Scott should be included in the thirteen-county relevant market area, although they are on the boundary line or just south of the line at the southeast edge. Production figures from this operation of defendants at Scott have been included in plaintiffs' statistical data. Ninety percent of stone purchased by NOAP and/or Langenderfer came from France or independents during the 1970s, and plaintiffs paid "board price" at France as well as at defendants' quarries.

In any event, accepting plaintiffs' proof (and some is distorted, as indicated), defendants' market share of stone before 1979 was insufficient to show a Sherman Act violation. In *Cargill, Inc. v. Monfort of Colorado*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme Court discussed a similar market share ratio possessed by Excel, a party in that proceeding:

> According to Monfort's expert witness, however, Excel's postmerger share of market capacity would be only 28.4%.... Thus Excel acting alone would clearly lack sufficient capacity after the merger to satisfy all or most of the demand.... With only a 28.4% share of market capacity and lacking a plan to collude, Excel would harm only itself by embarking on a sustained campaign of predatory pricing.

*Id.* at 120 n. 15, 107 S.Ct. at 494–95 n. 15.

*Cargill* referred to a definition of predatory pricing set out in *Langenderfer I*, and made reference to Areeda & Turner, *Williamson on Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 1337, 1348 (1978), suggesting that even a 60 percent share would not be enough. *Cargill*, 479 U.S. at 119 n. 15, 107 S.Ct. at 494–95 n. 15. The Court discussed predatory pricing allegations further:

> Claims of threatened injury from predatory pricing must, of course, be evaluated with care. As we discussed in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.* [475 U.S. 574, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986) ], the likelihood that predatory pricing will benefit the predator is "inherently uncertain: the short-run loss [from pricing below cost] is definite, but the long-run gain depends on successfully neutralizing the competition ... [and] on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." 475 U.S. at 589 [106 S.Ct. at 1357]. Although the commentators disagree as to whether it is ever rational for a firm to engage in such conduct, it is plain that the obstacles to the successful execution of a strategy of predation are manifold, and that the disincentives to engage in such a strategy are accordingly numerous. *See, e.g., id.* at 588–593 [106 S.Ct. at 1356–59] (discussing obstacles to successful predatory pricing conspiracy); R. Bork, The Antitrust Paradox 144–159 (1978); McGee, Predatory Pricing Revisited, 23 J. Law & Econ., at 291–300; Posner, The Chicago School of Antitrust Analysis, 117 U.Pa.L.Rev. 925, 939–940 (1979). As we stated in *Matsushita* "predatory pricing schemes are rarely tried, and even more rarely successful." 475 U.S., at 589 [106 S.Ct. at 1357]. Moreover, the mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition; because "cutting prices in order to increase business often is the very essence of competition ... [;] mistaken inferences ... are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Id.*, at 594 [106 S.Ct. at 1360].

*Id.* 479 U.S. at 121 n. 17, 107 S.Ct. at 495 n. 17 (discussing § 16 of the Clayton Act).

In *Cargill*, the Court also discussed vigorous competition brought about by merger in a challenge by a smaller competitor:

> *Brunswick* holds that the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against

---

**23.** France apparently allowed discounts on stone prior to 1972. France's prices and those charged by independent quarries were different. Independent quarries sometimes gave a volume discount.

the loss of profits from practices forbidden by the antitrust laws. The kind of competition that Monfort alleges here, competition for increased market share, is not activity forbidden by the antitrust laws. It is simply, as petitioners claim, vigorous competition. To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1057 (CA6), *cert. denied*, 469 U.S. 1036 [105 S.Ct. 510, 83 L.Ed.2d 401] (1984). *Id.* 479 U.S. at 116, 107 S.Ct. at 492. The latter quotation was cited again with approval in *Atlantic Richfield Co. v. USA Petroleum Co.*, — U.S. —, 110 S.Ct. 1884, 1892–93, 109 L.Ed.2d 333 (1990). *See also United States v. Syufy Enterprises*, 903 F.2d 659 (9th Cir.1990).

But for NOAP's relationship as a principal supplier to Langenderfer, we find that it has established no antitrust injury by reason of defendants' stone and sand activities and mergers during any relevant period. Plaintiffs' exhibits Nos. 27 and 32 indicate that over a ten-year period (1967–1976), it purchased two and a half times as many tons of sand and stone from France's nine locations as it did from all defendants and paid the same average price over this period of time. (Included in the purchases from defendants were sand and stone purchased from Michigan Stone.) That same exhibit reflects a total of only 10,000 tons of sand purchased by plaintiffs from Tri-State, acquired by defendants. The record also indicates that none of the plaintiffs were among the largest customers buying sand and/or gravel from Tri–State or defendants. NOAP's claim of approximately $73,000 based on variation in prices charged and alleged overcharges at defendants' quarries for stone (and/or sand) is clearly unallowable in any event. NOAP also has failed to establish that it was

directly injured by defendants' sand and stone or quarry operations, even if deemed to be designed as anticompetitive in nature or motivation. We find no entry barrier to the market insofar as sand production is concerned.

■ May NOAP nevertheless recover for indirect damages, apart from the sand and stone aspects of this controversy, by reason of anticompetitive conduct of defendants, as paving contractors, directed toward and harming Langenderfer? We must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them" to answer this question. *Associated General Contractors v. Calif. Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983). This court has focused on the directness of the injury in a claim of this kind in *Volasco Products Co. v. Lloyd A. Fry Roofing*, 308 F.2d 383 (6th Cir. 1962), *cert. denied*, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963). We have also looked to see whether the injury claimed is arguably within the zone of interests protected by the antitrust laws. *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142 (6th Cir. 1975). *See also* Sherman, *Antitrust Standing: From Loeb to Malamud*, 51 N.Y.U.L.Rev. 374 (1976). The inquiry resembles the "elusive" test of proximate cause in a given situation. *Associated General Contractors v. Carpenters*, 459 U.S. at 535–36, 103 S.Ct. at 907.

A number of other factors may be controlling. In this case it is appropriate to focus on the nature of the plaintiff's alleged injury. As the legislative history shows, the Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market. Last Term in *Blue Shield of Virginia v. McCready, supra* [457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149], we identified the relevance of this central policy to a determination of the plaintiff's right to maintain an action under § 4 [of the Clayton Act]. McCready alleged that she was a consumer of psycho-

therapeutic services and that she had been injured by the defendants' conspiracy to restrain competition in the market for such services. The Court stressed the fact that "McCready's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." 457 U.S., at 483 [102 S.Ct. at 2550], citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* 429 U.S. 477, 487–489 [97 S.Ct. 690, 696–98, 50 L.Ed.2d 701] (1977). After noting that her injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market," 457 U.S., at 484 [102 S.Ct. at 2551], the Court concluded that such an injury "falls squarely within the area of congressional concern." *Ibid.* *Associated General Contractors v. Carpenters,* 459 U.S. at 538, 103 S.Ct. at 908–09.

NOAP claims damages because of the alleged wrongful injuries to sister corporation Langenderfer, its principal customer, leading to the latter's demise as a direct paving contractor competitor of defendants. A factor to consider under these circumstances is "the directness or indirectness of the asserted injury" *by NOAP.* Langenderfer, as an "immediate victim," suffered direct injury, which will be discussed below. *See Associated General Contractors,* 459 U.S. at 540–41, 103 S.Ct. at 909–10.

We must look, then, under *Associated General Contractors* principles, to "the chain of causation," and whether "the alleged effects" on NOAP also "may have been produced by independent factors," and whether or not its claim is merely "speculative" in nature. *Id.* at 541, 542, 103 S.Ct. at 910, 910–11. Courts have a legitimate interest in these cases of avoiding the "risk of duplicate recoveries on the one hand or the danger of complex apportionment of damages on the other." *Id.* at 543–44, 103 S.Ct. at 911. *See also Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and *Kansas and Missouri, etc. v. Utilicorp United,*

*Inc.,* —— U.S. ——, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990).

We have cited, with approval, a rule adopted in the Second Circuit:

The oft-cited decision of *Calderone Enterprises v. United Artists Theatre Circuit,* 454 F.2d 1292 (2d Cir.1971) provides the following rule:

"[T]his court has committed itself to the principles that in order to have 'standing' to sue for treble damages under § 4 of the Clayton Act, a person must be within the 'target area' of the alleged antitrust conspiracy, i.e., a person against whom the conspiracy was aimed, such as a competitor of the persons sued. Accordingly, we have drawn a line excluding those who have suffered economic damage by virtue of their relationships with 'targets' or with participants in an alleged antitrust conspiracy, rather than being 'targets' themselves."

*Id.* at 1295 (emphasis added). *Calderone,* therefore, excludes as targets those "who have suffered economic damages by virtue of their relationships with 'targets'." *Id.* at 1295.

*Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1081 (6th Cir.1983) (footnote omitted).

We discussed the relationship between direct injury, proximate cause, and standing in light of *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Blue Shield of Va. v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); and *Associated General Contractors,* in *Southaven Land.* We concluded that

innumerable elements, including proximity and directness, constitute proper areas of inquiry in identifying a "person" injured by reason of a violation of the antitrust laws within the meaning of § 4. Examination of these factors facilitates identification of "who is entitled to prosecute an action under § 4." *Associated General Contractors, supra.*

*Id.* at 1085 (footnote omitted).[24]

Although the issues are extremely close as to NOAP's antitrust claims of indirect

---

**24.** *Southaven Land,* like *Associated General Con-* tractors, discusses § 4 of the Clayton Act but it

injury by reason of Langenderfer's direct injury, we conclude that NOAP may not claim damages in this indirect capacity. We recognize that NOAP may be encompassed by the broad language of the Sherman Act, but we are persuaded that the principles of *Associated General Contractors,* considered collectively, bar this claim. We reach this conclusion because (1) NOAP has no proven direct claim with regard to stone and sand; (2) its claim is essentially indirect and derivative of Langenderfer's; (3) NOAP was essentially only a minor consumer of defendants' products and had available independent and competitive resources; and (4) its indirect and separate claims are speculative and involve the serious risk of "duplicative recoveries." [25]

We, therefore, REVERSE the award of damages insofar as NOAP's claims are concerned and, consequently, we REVERSE any award of attorney fees based on a jury award to NOAP.

## VII. ARTHUR S. LANGENDERFER CLAIM

For the second time a jury has examined the evidence adduced in this antitrust dispute between Langenderfer, a paving contractor, and defendants. At the first trial, the jury found "actual damages" of $982,-117, which we set aside for a new trial. Upon the conclusion of the proof at the second trial, the jury returned a verdict of $1,675,000 (coupled with the NOAP claim) based upon its response to interrogatories to the following effect (as to Langenderfer, a separate corporation):

(1) There was a relevant market consisting of limestone, sand, and asphalt used in ODOT and OTC asphalt paving contracts and Langenderfer competed in this market.

(2) There was a relevant product market consisting of both ODOT and OTC asphalt paving contracts and Langenderfer competed in these markets.

(3) There was a relevant geographic market or submarket for Langenderfer (the 13 counties).

(4) Defendants had monopoly power in the relevant markets as to limestone, sand, and asphalt used in ODOT and OTC contracts.

(5) Defendants willfully acquired and used monopoly power in each of these relevant markets.

(6) Defendant engaged in anticompetitive conduct by making acquisitions "to exclude and/or injure competition and increase Johnson's power which he succeeded in doing."

(7) Defendants' monopolization caused injury to the business and property of Langenderfer.

(8) Defendants had a specific intent to achieve a monopoly on the relevant markets and engaged in anticompetitive conduct to achieve a monopoly.

(9) Langenderfer suffered injury to its business or property as a result of defendants' attempt to monopolize.

Defendants moved for a judgment notwithstanding the verdict, which was overruled viewing the evidence on behalf of Langenderfer (and other plaintiffs who also obtained a favorable jury verdict) "in the light most favorable to plaintiffs," with the district court's statement that the "judge's duty is essentially to see that there is no miscarriage of justice." We have heretofore indicated that the district court was in error in failing to direct a verdict, or in refusing to grant j.n.o.v. with respect to other plaintiffs. After full consideration of all of the evidence in the view suggested by the district court, and after reviewing the applicable law, we are persuaded that Langenderfer was entitled to effect a recovery for damages from defendants.

In *Langenderfer I,* as noted by the district court, we held that

Brunswick [429 U.S. 477, 97 S.Ct. 690] requires that Langenderfer's injury result either from a lessening of competi-

is entirely relevant to discussion of the anti-trust claims in this case.

**25.** *See Associated General Contractors,* 459 U.S. at 544, 103 S.Ct. at 911.

tion due to the acquisitions or from "anticompetitive acts made possible" by the acquisitions.... [T]he issue of whether Langenderfer's injuries resulted from "anticompetitive acts made possible" by the acquisitions was properly a jury question.

729 F.2d at 1058–59.

■ The jury responded to an interrogatory that defendants made acquisitions to affect competition adversely and, in effect, succeeded in doing so. Our function is to determine whether the jury acted without any substantial or sufficient basis on the evidence in the case, considered favorably from Langenderfer's standpoint, in rendering its substantial verdict. Contrary to plaintiffs' assertions in their brief, we note first that much of the evidence in the case did relate to defendants' bidding practices characterized by various of plaintiffs' witnesses as unrealistically or oppressively low so as, allegedly, to foreclose successful bidding on ODOT and/or OTC jobs by others. The district court did instruct the jury, however, that "defendants' profitable bidding does not constitute anticompetitive conduct as a matter of law, and you may not base a verdict on the fact that defendants were able to bid lower than competitors and still make a profit." We believe that the instruction cured improper inferences that might otherwise have been drawn by the jurors to the effect that defendants' asserted predatory pricing practices (bidding too low) were the real basis for Langenderfer's (and other plaintiffs') cause of action for anticompetitive conduct.

■ The district court's jury instructions advised the jury that plaintiffs contended first that defendants were engaged in "monopolistic stone pricing." As previously noted, we conclude that plaintiffs' proof in that respect failed as a matter of

law. The district court properly included in its jury instructions the following:

[I]n deciding whether defendants' limestone market share suggests to you that defendants have monopoly power, you may not combine defendants' market share with France's market share.

There was simply *no adequate evidence* to establish that defendants were engaged in monopolistic stone pricing, or that defendants controlled or attempted to control stone or quarrying in any relevant market claimed by plaintiffs. Nor was there meaningful evidence to show that defendants tied "the sale of stone and sand to the sale of asphalt," as contended by plaintiffs at trial. There was no showing that defendants controlled the sources or supply of sand in any relevant market claimed. This was one basis for holding that NOAP failed to prove its claim.

The remaining contentions of Langenderfer (and other plaintiffs except Sader), as included in the district court's jury instructions, were

(1) "price or profit squeezing and cross subsidization;" [26]

(2) "leveraging its [Johnson's] position in ODOT and OTC;"

(3) "intimidating, discouraging, coercing and retaliating against competitors."

*See also supra* note 1.

■ Langenderfer's brief tracks its contentions after noting that defendants had stipulated the "ODOT/OTC asphalt paving market in the thirteen counties in the *Langenderfer I* appeal. 729 F.2d at 1052–1053." We conclude that this thirteen-county ODOT/OTC asphalt paving market is established. Langenderfer then claims that defendants' alleged "monopoly over OTC/ODOT work extended to various submarkets and gave defendants anticompetitive leverage over asphalt paving work for counties, municipalities, townships,

---

26. The district court discussed in the jury instructions plaintiffs' contention about "price squeeze" or "profit squeeze" or "cross subsidizing." This contention was that "defendants have *used their monopoly power in stone* to gain an unfair advantage in paving." (emphasis added). As we have seen, however, defendants did not have sufficient market power or price control in limestone to constitute monopoly power. Plaintiffs' theory of "duopolization" through their expert witness, Dalton, simply had no legal basis of support in treating and combining the shares and practices of France with those of defendants to evidence alleged monopoly power and control.

etc." In light of our previous detailed discussion about defendants' sand and stone operations, the relevant product markets are ODOT and turnpike asphalt paving contracts and the supply of asphalt used therein, but not "the supply of approved construction materials," such as stone and sand, which Langenderfer essentially obtained from its own sources, its sister corporation NOAP, and others. Plaintiffs concede that the market for ODOT/OTC work "is distinct from that done for counties, townships, municipalities and private parties." Plaintiffs' Brief at 7; *see* Burton MacRitchie's testimony.

Because we are concerned with respect to Langenderfer, not with defendants' stone and sand operations (which the proof failed, as a matter of law, to show were either monopolies or involved any dangerous probability of becoming monopolies), we will consider the asphalt and asphalt paving aspects of the case as proved by Langenderfer.

 We conclude that defendants may not be held liable for antitrust conduct to the extent that, as asphalt paving contractors, they acquired additional limestone and/or sand sources which added to their efficiency and ability to submit profitable low bids on public highway contracts. Burton MacRitchie testified that during the time defendants began to expand and integrate their operations, he, as part owner and a principal in Langenderfer, desired to do the same when opportunities presented themselves. Arthur Langenderfer, the majority stockholder, however, declined to take advantage of such business opportunities, and MacRitchie conceded this was a bad business decision. Defendants' low bidding, of course, in a real sense, inured to the benefit of the public and extended over many years in the relevant market. We have found previously no proven predatory pricing by defendants. There is no substantial evidence that defendants refused to deal with Langenderfer (or other plaintiffs) in respect to limestone or sand

sources except on rare occasions where defendants themselves needed to utilize these materials in their asphalt production and paving with respect to successful bids. Defendants' stone prices were competitive with France, the largest producer in the relevant market, and were not substantially different from prices charged by plaintiffs themselves, although such prices varied from one geographic area to another.

 The acquisitions by defendants proved by Langenderfer were set out in *Langenderfer I.* The first pertinent acquisition other than quarrying or asphalt paving contracting or asphalt, as such, was the 1961 acquisition of C.P. Calaway, a bridge contractor. Nothing in this acquisition, however, would tend to show elimination of an asphalt paving contractor competitor, nor does it relate to control over asphalt supply or the "concrete and road metal" market, in our view. The acquisitions which might reasonably be deemed to bear upon asphalt paving competition began in 1969 with Price Companies. Mr. Price testified that his company was only a "very minor" competitor with defendants' one plant at Parkertown, near the eastern boundary of the relevant market area. Price sold one of his asphalt plants in the Toledo area to another party, and it was Price who contacted defendants to buy his asphalt paving business. Defendants met his asking price for the business in the eastern fringe of the thirteen-county area and required that he sign a noncompetition agreement. Defendants also agreed to buy sand from Price as a part of the package, with a right of first refusal in the event of a proposed sale of the sand operation.[27] It is difficult, under all the circumstances, to find the Price acquisition to be anticompetitive with respect to Langenderfer's operations located some considerable distance away. There is no indication that Price was ever in substantial competition with Langenderfer, and Price retained, and still operates, his sand production facilities.

**27.** Price's principal plant at Norwalk, Ohio, was *outside* the bounds of the thirteen-county area by a distance of approximately 15 miles, and he operated principally in Huron and Erie Counties, outside the relevant market area.

The first significant paving contractor acquisition by defendants was Ohio Engineering Co., which conducted about one-half of its operations in the thirteen-county area (the southeast portion) and one-half outside (Crawford, Hardin, Allen, and Marion Counties including Delaware). Ohio Engineering operated plants situated on National Lime & Stone's property in Findlay, Hancock County, when acquired by defendants in 1970, and one at Carey, Wyandot County. (Other Ohio Engineering Co. asphalt plants were situated south of the relevant market area but later moved within that area.) Ohio Engineering had been closely allied with National Lime & Stone Co., and it was a competitor of defendants "on rare occasions." Ohio Engineering Co. was purchased in 1970 and subsequently operated as a division of defendants.

In 1971, defendants acquired Creager, a competitor that was failing and ultimately was acquired by defendants for $1 plus the debt it owed for materials and supplies. No reason is shown why other parties, including plaintiffs, might not have acquired Creager for a nominal price in 1971 had any of them sought to do so. While this may be deemed to be acquisition of a failing competitor, a nonunion operator, it is of little practical or legal effect since it is clear that had no acquisition been made, Creager would have ceased to do business entirely. That competitor would simply have gone out of business in 1971. Creager, in other words, without dispute, was not a *viable* competitor in any sense when acquired in 1971.

With respect to Ohio Turnpike contracts awarded during the relevant period, plaintiffs' exhibit 69 reflects that Langenderfer bid successfully on one joint venture with Johnson from 1967 through 1969, during which time defendant Johnson won one other bid. In 1970 and 1971, Langenderfer was unsuccessful on one bid each year, whereas Johnson was successful on one bid each year. Johnson was the only successful OTC bidder on three jobs in 1972, Langenderfer unsuccessfully bidding on two. On the other hand, Langenderfer was successful on its one bid in 1973, Johnson on

two of three; in 1974, there were no bids and in 1975, both Langenderfer and Johnson were successful in one of two bids. In 1976, Johnson was successful in its one ODOT bid, but lost to Langenderfer on the one competitive bid in 1977, apparently the last time Langenderfer bid on OTC projects. In sum, from 1973 through 1977 Langenderfer was successful on three of its five OTC bids and Johnson was successful on four of seven, but the latter won on the larger jobs. This evidence of plaintiffs, standing alone, is insufficient to establish monopolistic control of the OTC market by defendants from 1967 through 1977. During this same period, two other paving contractors bid successfully on OTC jobs, and there were a number of other bidders. This data of plaintiffs indicates, if anything, that Langenderfer became more active from 1973 through 1977 and was relatively more successful than it had been before that time on OTC bids.

According to plaintiffs' exhibit 70, defendants' share of the Ohio ODOT market decreased from 1966 through 1968 (down to 29 percent), but then increased dramatically in 1969 to 73 percent. During this period, Langenderfer's market share (approximately 3 percent of its own bids) remained relatively constant (up to 8 percent in 1968). In 1971, defendants' market share of the ODOT contracts dropped to 11.8 percent while Langenderfer's was 11.4 percent. Through 1971, then, there is clearly no statistical showing, as a matter of law, that defendants had monopoly power or likelihood of monopoly power in the ODOT market. Plaintiffs' exhibit 71 reflects that Langenderfer's dollar amount bid successfully on contracts (ODOT and OTC) in 1971 was over $814,000, which was more than double the average of the comparable dollar amounts won from 1968–1970. Langenderfer's 1971 amount constituted a higher market share of ODOT and OTC contracts (8.7 percent) than it realized even in 1968 (6.4 percent), the year in which it realized its highest pretax net income. This would demonstrate no monopoly threat by defendants in 1971 even *after* the acquisitions of Price, Ohio Engineering and Creager. Ex-

cluding the year 1969, which seems to be an anomaly,[28] defendants' average annual market share of the Ohio ODOT contract market from 1966 through 1971 was 34.6 percent, and there were numerous serious competitors, including Langenderfer, in that market. This is an entirely insufficient basis for a monopolization showing through 1971, especially since the defendants' share was decreasing in 1970 and 1971 with respect to ODOT asphalt paving business.

For the years following 1971 and until Langenderfer went out of business, plaintiffs' exhibit 70 reflected the following as to ODOT market share:[29]

| YEAR | DEFENDANTS | LANGENDERFER |
|------|-----------|--------------|
| 1972 | 55% (65%) | 5% |
| 1973 | 52% (58%) | 16% |
| 1974 | 83% (83%) | 7% |
| 1975 | 38% (53%) | 6% |
| 1976 | 57% (63%) | 10% |
| 1977 | 75% (70%) | 3% |
| 1978 | 45% (51%) | –0– |
| Average (7 yrs.) | 58% (63%) | 7% |

In contrast to the years through 1971, the above data, accompanied by the paving contractor and asphalt plant acquisitions made in 1970, 1971, and 1972, are sufficient to indicate that Langenderfer may reasonably have proved the cause of action alleged, coupled with the defendants' high percentage of ODOT winning bids from 1973 until Langenderfer's termination of business, and other circumstances of defendants' growing economic power. We reach this conclusion being mindful at the same time of this statement by a prominent authority in this respect: "There is substantial merit in a presumption that market shares below 50 or 60 percent do not constitute monopoly power." Areeda & Hovenkamp, *Antitrust Law*, § 518.3 (1988 Supp.).

Langenderfer charges not only monopolization but also attempted monopolization for the pertinent period preceding its going out of business. There is evidence, as previously noted in *Langenderfer I*, that defendants "intended to eliminate competition and dominate the market." 729 F.2d at 1054. We recognized also in *Langenderfer I* that "Johnson attained economies of scale which enabled it to operate at a much lower cost per paving project than its competitors." 729 F.2d at 1058. Langenderfer has, we believe, made a sufficient factual showing to support the essence of the jury's finding that Langenderfer suffered injury by reason of defendants' conduct and that such injury resulted in significant part from "a lessening of competition due to acquisitions or from 'anti-competitive acts made possible' by the acquisitions." *Langenderfer I* at 1058. We do not find that plaintiffs have made any required showing of "monopolistic pricing" in stone and sand, as noted, but acquisitions, elimination of competition, and other anticompetitive conduct by defendants, referred to also in *Langenderfer I*, support an award for Langenderfer. We find also that an interstate commerce nexus has been established based on the proof submitted.

Although "monopolistic pricing" in stone and sand was not established, acquisitions by defendants of quarry sites coupled with the use of lengthy non-competition agreements and other circumstances did foreclose production and efficient use of such quarries and limestone by Langenderfer and others as competitors of defendants. Plaintiffs point also to the comparative size and economic power of defendants, particularly from and after 1970, to support their argument in this respect. The jury is entitled "to look at the whole picture" with

28. The 1969 pretax profit figure of $189,382 for Langenderfer is indeed difficult to accept as "normal." It is considerably more than the same pretax profit totals for 1966, 1967, 1968, and 1970 *combined.* Plaintiffs' exhibit 71 reflects also that in 1969 Langenderfer was awarded bids on three ODOT and OTC contracts totalling only $237,168. It is not possible, therefore, that Langenderfer's profits for 1969 came from ODOT and OTC work. (In 1968, the successful bid awards for Langenderfer were $380,063; thus, this data reflects that ODOT and OTC contracts could not have carried over as a substantial part of a profit source in 1969.) We are, therefore, inclined to regard this 1969 figure as a less-than-reliable basis for claiming average profits by Langenderfer. The basis for any substantial profit in 1969 must have been from non-ODOT/OTC work.

29. The figures in parentheses reflect defendants' combined ODOT/OTC market share. Plaintiffs' exhibit 71; *Langenderfer I,* 729 F.2d at 1054 n. 6.

respect to allegations and evidence of Sherman Act § 2 violations. *American Tobacco Co. v. United States*, 147 F.2d 93, 106 (6th Cir.1944), *aff'd*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

We conclude, although the issue is a very close one, that Langenderfer has presented sufficient proof for a reasonable jury to find defendants guilty of unlawful monopoly or attempted monopoly and anticompetitive acts in asphalt paving contracting in the northwest Ohio relevant market area in OTC and ODOT work during the 1973–1978 period.

Damages

Langenderfer was awarded damages by the jury of $1,675,000 (before trebling). This figure was arrived at using figures supplied by plaintiffs, and reflects injury for the years until 1978, the year Langenderfer went out of business, as well as for the years 1978–1987. This damage calculation includes damages for *both* Langenderfer and NOAP.

 An appellate court reviewing damages may adjust and/or correct the jury's award based on clear error in calculation and based on the actual claims submitted to the jury in closing argument. *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1549–50 (8th Cir.1989). We find such an adjustment appropriate for several reasons. First, as noted, the jury's award was for Langenderfer and NOAP, and we have concluded that NOAP is entitled to no recovery. Furthermore, we find that some of the dollar figures offered by plaintiffs and their experts simply fail to reflect economic reality, and we shall make adjustments accordingly, while continuing to give Langenderfer the benefit of all reasonable inferences.

*Base damages*

The first step in computing damages suffered by Langenderfer as a result of defendants' anticompetitive activities is to arrive at a reliable estimate of Langenderfer's average profits in representative years before it suffered antitrust injury. At trial, plaintiffs introduced evidence of Langenderfer's profits for the years 1966–1970, and arrived at an average annual profit of $81,758, including NOAP. When NOAP's profits are eliminated, the average annual profit for Langenderfer alone for 1966–1970 is $58,353. Plaintiffs' exhibit 150. We believe that this figure is not a reliable barometer for computing losses suffered by Langenderfer.

The "principal portion" of Langenderfer's work in the seventies was "state highway work ... [because] by that time the bulk of the interstate system was completed." (B. MacRitchie). This winding up of interstate work in the early 1970s had an adverse effect on many highway paving contractors in northwest Ohio,[30] and "the majority of the [public] work was ODOT and turnpike" for Langenderfer during the relevant damages period before it terminated its asphalt paving operations in 1978. During the pertinent times, Langenderfer (or its sister corporations) remained in the limestone quarry business, generally a more profitable business. While Langenderfer was losing money on its state work in the 1970s, it continued to do private road contracting and paving work profitably even though competing with defendants. In 1971, for example, private work constituted about 75 percent of Langenderfer's volume. Although after 1971 Langenderfer did an increased volume of state work, this became increasingly unprofitable whereas the private work remained profitable.

In the early 1970s, Langenderfer had a profit on the 75 percent of its paving business in the private (non-ODOT/OTC) area. Plaintiffs' exhibit 150, moreover, shows a precipitate drop in Langenderfer's "base period pretax profit" from 1968 to 1970—$85,047 and $24,812, respectively, in the last two years. This affords no legitimate basis for Langenderfer's claiming an "average" profit loss of $58,353 based on pretax profits during the years 1966–1970, when

---

**30.** Burton MacRitchie conceded than the amount of work available to paving contractors in northwest Ohio dropped by more than half during the early 1970s; it provided "fewer opportunities to bid." Langenderfer began losing money at the same time in 1971.

interstate highway construction was at its peak, as Langenderfer has done here. Plaintiffs' exhibit 150.

We have indicated that there was insubstantial evidence that defendants had monopoly power in, or a dangerous probability of success at attempted monopolization in, the ODOT/OTC market through 1971 or 1972, and there is little hard evidence to justify using the 1966–1970 average annual pretax profits of $58,353 for Langenderfer as a basis for claiming "normal" profits to utilize as a comparison to the actual profits or losses from 1973 forward when defendants dominated the ODOT bidding. M & B's profits, as a realistic competitor, in comparison, reached its average 1966–1970 profits only once between 1980 and 1984. Defendants' average net profit expressed as a percentage of its consolidated asphalt and construction revenues was 4 percent between 1966 and 1970. Between 1979 and 1984, defendants' net profit percentage was only 2.3 percent. Plaintiffs' exhibit 119S. From 1978 through 1985, defendants' net income percentage, as reflected by the same exhibit, was less than 2.4 percent compared with the 1966–1970 figure of 4 percent. (Income from quarrying operations enjoyed a consistently higher ratio.)

An examination of plaintiffs' exhibit 71 reflects that for the years 1966–1970, plaintiffs successfully bid the following totals on ODOT/OTC contracts; the pretax profit and loss claimed during these years is also indicated (with losses indicated by parentheses):

| YEAR | BID AMOUNT | LANGENDERFER PROFIT |
|------|-----------|---------------------|
| 1966 | $314,755 | $ 59,663 |
| 1967 | 349,812 | 67,140 |
| 1968 | 380,063 | 189,382 |
| 1969 | 237,168 | 85,047 |
| 1970 | 600,810 | 24,812 |

There is no correlation between the amount of profit reflected and the ODOT/OTC bidding and this important type of work done for these years claimed by plaintiffs to constitute the normal, non-monopoly base period. It would appear, however, that the less the amount of ODOT/OTC work done by Langenderfer, the greater was its profit. The profit realized from *non*-ODOT/OTC work is not relevant to Langenderfer's contention in this case that it is seeking damages from defendants because they illegally, through monopoly practices, deprived it of expected ODOT/OTC bids and work. We conclude, therefore, that a realistic allocation of ODOT/OTC profit for the base years would be at most one-half of the $58,353 annual profit for Langenderfer utilized by plaintiffs and their experts, or $29,177. This gives Langenderfer every reasonable favorable inference in a careful analysis of the proof.

*Losses, 1973 through 1977*

In the calculation of damages made by Langenderfer, three alternative calculations were offered by their accountant, Thomas Good, for the period until 1978 (the year Langenderfer went out of business), using the nearly $82,000 "base period profit" figure before taxes, which we have determined to be unreasonable, arbitrary and speculative, and thus not allowable.

Good's first method of calculating damages for Langenderfer through 1977 resulted in a claim of $818,085; the second $536,286,[31] and the third $664,261 (the so-called "yardstick method").[32] This latter figure is not a reasonable estimation because it is based on a comparison of data not shown to be material to the relevant market. Nor can we accept, moreover, the first method utilized by Good. We do not consider it reasonable for Langenderfer to recover damages on jobs which it bid when it reasonably should have known it would realize a loss, taking into account its then known costs, direct, fixed, and variable.

**31.** The second method, unlike the first, eliminated bids made by Langenderfer on jobs in which concededly Langenderfer did not recover its fixed costs.

**32.** This third method involved calculation of Langenderfer's "revenues on ODOT and turnpike projects for the work it performed during the period 1973 through 1977" based on "an analysis of what it would have had on those bids had it been able to bid at the levels being bid in the remainder of the state." We consider this method to be unsupported by the proof and highly conjectural.

Good's method one, in sum, included damages for losses which Langenderfer experienced on bids which were below costs. We conclude as a matter of law the taking of a loss under these circumstances is not justifiable. Langenderfer is held to the familiar principle of minimizing its damages. We, therefore, discard a recovery based on method one.

The highest basis for damages through 1977, then, would be Good's calculation of $536,286, utilizing Langenderfer's own calculations, and utilizing the second alternative method which excluded bids that exceeded "actual costs" (and based on the $81,758 annual pretax profit figure).

Because this $536,286 figure included NOAP and was based on an inflated annual base of $81,758, an adjustment is in order. The base figure arrived at above, $29,177, is 35.7 percent of the base figure used in plaintiffs' calculations. An appropriate award, then, for the years through 1977, is 35.7 percent of $536,286, or $191,454 (before trebling).

*Losses, 1978–1987*

As noted, Langenderfer sought and received a jury award including damages for the years 1978–1987 based on an annual profit figure that is not realistically supported by the evidence. Using the revised base figure arrived at above, $29,177, applied to the ten years in question,[33] Langenderfer may receive damages of $279,650 (before trebling) for the years 1978–1987.

Based on these figures, then, Langenderfer may receive damages in the amount of $191,454 for the years 1973–1977, and $279,650 for the years 1978–1987, for a total of $471,104 before trebling.

In sustaining an award for Langenderfer, we have given careful attention to defendants' market share, its comparative economic position, some evidence of anticompetitive acts, and other market factors in the asphalt paving aspect of the case as distinguished from claims of some other plaintiffs. The issues in the Langenderfer–Johnson dispute are fraught, however,

with problems. Johnson chose to expand and to purchase assets and resources, some of which were, or might have been, available to Langenderfer, other plaintiffs, or to other parties. At a critical juncture, Langenderfer chose, as a matter of policy, to forego some expansion into limestone, quarrying, or sand sources within the relevant market. Langenderfer complains, nevertheless, because Johnson, and all defendants, made the choice to expand and to integrate operations—asphalt paving and contracting, quarrying, sand production—and to purchase additional strategic resources, and thus defendants became able to bid more efficiently. It is only by giving Langenderfer the full benefit of presumptions and inferences that may well have been made by the jury, to the extent not proscribed by other legal principles, that we are able to sustain an award of damages in this hotly contested controversy.

Entry barriers, or the lack thereof; existence of other competition, or lessening thereof; and the very fact that government bidding at low prices over a lengthy period was at the heart of this case, all have figured into our final resolution of this complex antitrust lawsuit.

We have also considered the unusual posture of the State of Ohio in its brief as *amicus curiae* urging affirmance of the judgment of the district court with respect to monopolization "of the highway paving market in northwest Ohio." Reference was made in the *amicus* brief that defendants had an average share of the paving market from 1972 to 1985 of 58 percent and that defendants "likewise controlled the dominant share of the materials markets." We find no citation to the record or the proof, however, in support of this latter assertion, and we have concluded to the contrary. Ohio's Brief at 8 also makes the concession, citing III Kintner, Federal Antitrust Law 357–58 (1980), that "monopoly power is more likely to be found where market shares exceed 75–80%." We are prone to agree with this observation, and

---

**33.** For the last two years in question, 1986 and 1987, plaintiffs discounted their claimed damages by 17.03 percent annually. Plaintiffs' exhibit 150. We have applied the same discount to the newly calculated damage figure. For 1986, this comes to $24,931; for 1987, $21,303.

this market share data makes Langenderfer's case close and problematic. Ohio, in any event, takes the position that benefits of defendants' low bidding in Ohio paving contracts over many years are merely transitory and are "outweighed by the dangers of the elimination of a competitive market place." We note, however, that Ohio never sought to intervene in *Langenderfer I* or in these proceedings, and never has sought to enforce its own antitrust laws against defendants over the fifteen years and more of their low and successful bidding, which presumably would benefit the state and its citizenry.

Taking all these factors into account, we can affirm the lesser award to Langenderfer on the evidence submitted, viewing the evidence favorably from Langenderfer's perspective, and resolving reasonable questions of damages in Langenderfer's favor.

We have adjusted the damage award in this case in light of reversal as to several plaintiffs and in order to avoid delay in further remand and hearings concerning damages as to Langenderfer. (We discuss the basis for equitable relief in this case beyond a single award of damages, costs, and redetermination of a reasonable attorney's fee in a separate section of this opinion.)

We AFFIRM a damage award for Langenderfer, therefore, in the amount of $471,104 before trebling.

## VIII. ATTORNEY FEES

Insofar as attorney fees have been allowed plaintiffs and assessed against defendants by the district court based on legal services rendered for M & B, Sader, MacRitchie, and NOAP, we must set these fees aside. *See Wooldridge v. Marlene Industries*, 898 F.2d 1169 (6th Cir.1990). Plaintiffs' attorneys may not be compensated for time spent in investigating, pursuing and litigating these claims. We must remand the case for a proper award based only on services rendered for Langenderfer with respect to a reduced judgment amount (before trebling) of $471,104 instead of $1,675,000 awarded by the jury for both Langenderfer and NOAP. We find no er-

ror in denial of the enhancement to the lodestar fee claimed by counsel for plaintiffs nor in the ten percent adjustment directed by the district court, nor in the years for which fees were found to be allowable. Neither do we find error in the setting of a lodestar rate by the district court.

## IX. INTEREST

Upon a thorough consideration of the action of the district court with respect to disallowance of postjudgment interest claim by Langenderfer and NOAP on the original *Langenderfer I* award, we find no error in the district court's handling of this issue. The district court's decision not to allow interest on the judgment vacated in *Langenderfer I* is, we believe, clearly supported by the Supreme Court's recent decision in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, —— U.S. ——, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). Upon remand, the district court may award postjudgment interest in a manner consistent with *Bonjorno*.

## X. OTHER EQUITABLE RELIEF

Finally, we generally find no error in the terms of the injunctive relief granted by the district court. A five year term is well within the bounds of the discretion of the district judge, and we will not extend the time as requested by plaintiffs. With regard to the question of divestiture, we find no basis for invocation of that doctrine with respect to acquisitions by defendants of quarrying and limestone operations or leases, a bridge contractor, or sand pit operations. Nor do we find generally a basis for divestiture of quarries or sand pits that may have been operated by asphalt plant operators or asphalt paving competitors. As to possible divestiture of Ohio Engineering, Creager, Northwest Materials, Union Quarries (as to paving operations only) and Dailey Asphalt, we construe *California v. American Stores Co.*, —— U.S. ——, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990) to indicate, even though it was an action brought by a state, not a private party such as Langenderfer, that this po-

tential § 16 Clayton Act remedy may apply contrary to our decision in *Langenderfer I*.[34] *American Stores*, 110 S.Ct. at 1866 & n. 28, citing 2 P. Areeda & D. Turner, *Antitrust Law* § 328b (1978), and *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 418–427 (1st Cir.1985). *Cia. Caribe* found fault with *I.T.T. Corp. v. G.T.E. Corp.*, 518 F.2d 913 (9th Cir.1975), a case we cited with approval in *Langenderfer I* for concluding that divestiture was not an "available remedy in a suit instituted by a private plaintiff." 729 F.2d at 1060. *American Stores* also suggested that "equitable defenses such as laches ... may protect consummated transactions...." 110 S.Ct. at 1867. In any event, we remand for further consideration the possibility of divestiture in the limited situations in which it may be available in this case subject to equitable defenses by defendants.

■ We find no error in the refusal of the district court to *restrict* competition as urged by Langenderfer—to limit defendants from bidding "every other" (50 percent) contract invitation on ODOT, turnpike, and local government asphalt jobs in northwestern Ohio. Other competitors, not parties in this case, have emerged as bidders on these jobs during the relevant years, and some of them have grown in their particular markets. We find no error in the refusal to preclude defendants from future acquisitions of bridge contractors. We also find no error in the district court's decision not to enjoin defendants to charge the same prices for limestone and sand in the Toledo area as they charge for these materials in other areas of the relevant market.

Finally, we find no basis to disturb the district court's decision not to mandate that defendants charge themselves the same prices for sand, stone, and asphalt produced by their own facilities as they charge others for these materials. While defendants may not unfairly nor invidiously discriminate between customers in the same class or status, we find no error in the court's refusal to direct and control internal pricing policies among the several different entities comprising the defendants' group. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and *Russ' Kwik Car Wash v. Marathon Petroleum Co.*, 772 F.2d 214 (6th Cir.1985). We note that plaintiffs and other competing parties have employed their own quarries, sandpits, and asphalt plants as a basis for bidding competitively against others who may not have such resources, and there has been no proof one way or the other as to whether they have charged the same prices among subsidiary entities as they do with others. That NOAP has taken steps to reenter the business would indicate further such activity among plaintiff entities.

## XI. SUMMARY

We REVERSE the judgments entered in this case for all plaintiffs except plaintiff Langenderfer. We REDUCE the amount of the judgment for Langenderfer (before trebling) to $471,104. We REMAND to the district court for a redetermination of reasonable attorney fees in light of our finding that the district court was not in error in its lodestar method of calculation and allowance of such fees. We find no error in denial of post–*Langenderfer I* interest.

We also REMAND to the district court for further consideration of possible divestiture as a part of the equitable remedy sought by Langenderfer, subject to equitable defenses presented by defendants. (We had previously determined in *Langenderfer I* that divestiture was not a proper remedy in a case brought by a private plaintiff and have reconsidered this view for the reasons indicated.)

The remands effected shall proceed in accordance with the principles herein expressed, but we entertain the hope that the parties themselves may reach agreement

---

**34.** *Langenderfer I* held that the order of the district court which did not include divestiture, provided "no ground for assignment of error."

after considering the import of our opinion in this lengthy and expensive litigation.